### THE MERCHANTS AND PLANTERS BANK v. THE CLIFTON MFG. CO.

1. EVIDENCE—PRINCIPAL AND AGENT.—Instructions to an agent cannot be proved until it is shown that the party giving the instructions had authority so to do.

2. PRINCIPAL AND AGENT.—Instructions limiting the previously ratified authority of an agent is not binding on a party dealing with such agent, unless such instructions be communicated to him.

3. IBID.—EVIDENCE.—LETTERS from principal to agent relevant here under issue raised by defendant, that it had no knowledge of over-drafts by agent.

4. IBID.—A party cannot properly object to a class of testimony upon a part of which it relies.

5. IBID.—WITNESS—CROSS-EXAMINATION.—Under the facts in this case, and examination in chief of defendant's witness, it was competent for plaintiff on cross-examination to ask such witness if at certain date defendant did not owe him for cotton.

6. BANKS.—A CHECK drawn on December 24th, and presented and paid on December 30th, is not stale.

7. BREACH OF TRUST—BANK—PRINCIPAL AND AGENT.—No testimony here to show that bank had such knowledge as would put it on inquiry as to breach of trust by defendant's agent. Kind of inquiry required of bank in such cases indicated.

8. PRINCIPAL AND AGENT—CHECKS.—Where a principal receives and uses cotton purchased by its agent by a post-dated check, it should pay the check without regard to its account with its agent, to which the seller was not a party.

9. IBID.—BANKS—COUNTER-CLAIM—BREACH OF TRUST.—A DEPOSITOR placing money in bank to be checked out by his agent for a special purpose, cannot set up as a counter-claim in tort against an over-

draft by such agent amounts paid by him to the bank for checks drawn by such agent in breach of trust, unless he show that the bank was guilty of gross carelessness or participated in agent's fraud, nor can he set up counter-claim in contract unless the bank paid checks drawn by such agent which it knew, or had good reason to know, or ought to have known, were drawn in violation of agent's authority.

10. LAW—EQUITY.—When exceptions only raise questions of law, it matters not whether the case is one at law or in equity.

11. REHEARING refused.

Before KLUGH, J., Spartanburg, October, 1898. Modified.

Action by The Merchants and Planters National Bank of Union *v.* The Clifton Manufacturing Co. The following is that portion of the Circuit decree relating to the Harris check:

The remaining item of the overdraft is the check for $2,299.23 in favor of R. W. Harris. It was drawn on the 11th day of December, 1896, and dated January 11th, 1897. Either before or shortly after the check was drawn the cashier of the bank was informed of it and was asked if it would be paid. He thought it a strange proceeding, but promised to pay it, not, however, before a very plausible reason had been given for the unusual transaction. Some few other post-dated checks were drawn about the same time by Fitzsimons, and the bank seems to have learned of one or more of them. It was the first time Fitzsimons had ever drawn such checks on the Clifton account. Fitzsimons left Union for his home in Charleston on December 25, 1896, stating that he would return about the 4th or 5th of January, following. He did not return at all. The Harris check was paid by the bank on January 12th. About the same time it developed that Fitzsimons was a defaulter in his account with The Clifton Company to the extent of many thousands of dollars. The Harris check was given in payment for cotton that was shipped to and received by The Clifton Manufacturing Company. At the time, in Decem-

21—56

ber, when this check was drawn The Clifton Company had
funds in the bank to its credit.    At the day of its date and
when paid the account was overdrawn more than a thonsand
dollars and the payment of this check swelled the overdraft
to its present proportions.    The plaintiff contends that a
post-dated check was within the legitimate scope of Fitz-
simons' authority and was valid and binding on The Clifton
Company.    Certainly a person may draw a,post-dated check
on his own account and there can be no objection to it on the
score of authority, but when an agent draws any kind of
check or bill .on his principal's account he must have the
authority of the principal or such draft will not be binding.
Authority to make one kind of draft does not include author-
ity to make one of another kind.    For instance, a person
authorized to draw present-dated checks could not under
such authority draw time or even sight drafts.    The ques-
tion here is, did authority in Fitzsimons to draw present-
dated checks confer upon him authority to draw post-dated
checks?    If not, did he have any authority to bind The Clif-
ton Company by a post-dated check?    A post-dated check is
essentially different from a present-dated one.    The latter is
payable immediately, the former is not payable until the day
of its date arrives, and before such day the bank cannot be
required to pay or even to accept it.    In cases of agency
additional points of distinction are such as the possibility of
the agent's authority being terminated by death, dismissal
or other cause before the day of payment arrives, the oppor-
tunity to perpetrate fraud on his principal, and the like.
The two kinds of paper are so essentially different that
authority to draw the one does not include authority to draw
the other.    The mere authority in Fitzsimons to draw
present-dated checks did not authorize him to draw post-
dated checks.    Did he have any authority to bind The Clif-
ton Company?    It is not claimed that he had any such
express authority from the company.    Could any such
authority be inferred from the nature of his agency
or from his conduct known to and ratified by the com-

pany? His agency at first was expressly to buy spot cotton for spot cash. As enlarged by his course of conduct, ratified and approved by his principal, he had authority to buy cotton through subagents, to make overdrafts and to buy cotton on time. In all these transactions he handled The Clifton Company's money or credit solely through the medium of present-dated checks. He drew no bills of exchange and made no notes or other money obligations in the name of The Clifton Company. He did not presume to draw a post-dated check until the 11th of December, 1896, and when it came to the knowledge of The Clifton Company that he had done this, it promptly repudiated the act. It cannot be said that there was any implied authority from the nature of his employment; it cannot be said that any such authority was inferable from conduct of his permitted by the company.

It is urged by the plaintiff that the cotton paid for by this check was received by The Clifton Company, and having received the benefit of the transaction they should be compelled to pay the check. If this were a case between the seller of the cotton and The Clifton Company there might be merit in this position, but it cannot avail the bank. It would be against good conscience for a cotton mill to procure cotton through the unauthorized act of its agent, then repudiate the act of its agent and refuse to pay the owner for his cotton and yet retain the cotton. But Harris has been paid for his cotton. The sale of the cotton was one transaction, the extension of the credit on the unauthorized check of Fitzsimons is a very different one. This item of the overdraft must be disallowed.

From Circuit decree both parties appeal.

*Messrs. Munro & McCravy* and *R. W. Shand,* for plaintiff. The latter cites: *What is necessary to determine whether the answer in this case raises an equitable issue:* 25 S. C., 114; 22 S. C., 77; 17 S. C., 538. *Findings of fact by Cir-*

*cuit Judge in law case are final:* 33 S. C., 359; 37 S. C., 435; 40 S. C., 115. *As to scope of agent's employment:* 51 Vt., 414; 1 Pet., 289; 7 Rich., 54; 12 Wall., 683. *Post-dated check on day of date is same as present-dated check:* 12 Rich., 525; 15 L. R. A., 134; 70 Penn. St., 474; 41 S. C., 189; 6 Duer., 82; 10 Wend., 307; 13 Wend., 134; 10 Wall., 604; 64 Mich., 344. *Bank knew of no restricted agency to buy cotton for cash only, and hence rightfully honored his post-dated checks:* 10 Rich., 336; 47 S. C., 147; 101 Ill., 595; 24 Ia., 98; 2 Story, 502; 24 Hun., 281; 90 N. Y., 678; 14 S. E. R., 555; 49 S. W. R., 938. *A principal cannot take the fruits of an agent's contracts and then repudiate them:* 78 Fed. R., 740; 56 Wis., 28; 11 S. C., 340; 71 Me., 91; 68 N. W. R., 488; 72 N. W. R., 375; 10 Wall., 644; 19 Wall., 484; Dud., 240; 5 Strob. Eq., 317.

*Messrs. Simpson & Bomar,* for defendant, cite: *Authority to draw present-dated check does not give authority to draw post-dated check:* 44 Mich., 345; 3 Rich., 42; 7 Rich., 525; 12 Rich., 451. *A statement of a fact not supported by testimony is error of law in Circuit Judge:* 54 S. C., 405. *Defendant's case is that its agent committed a breach of trust with its funds committed to plaintiff's care, and of this plaintiff knew, or ought to have known, and such defense is within the equity jurisdiction:* 43 S. C. *And if the bank knew of agent's breach of trust, it is liable to defendant:* 50 S. C., 250; 11 S. C., 408; 5 S. C., 390; 25 S. C., 340; 5 Rich. Eq., 272. *As to notice:* 52 S. C., 231. *No act operates as ratification unless with a full knowledge of the circumstances:* 3 Rich., 42; 7 Rich., 525; 16 S. C., 593; 42 S. C., 415; 44 Mich., 345. *Plaintiff's claim not liquidated demand, and should not bear interest:* 47 S. C., 186.

The opinion in this case was filed July 20, 1899, but on petition for rehearing, remittitur was stayed until

November 29, 1899. The opinion of the Court was delivered by

MR. JUSTICE POPE.    This action was commenced on the
16th February, 1897.    It came on for a hearing before his
Honor, Judge Klugh, at the spring, 1898, term of the Court
of Common Pleas for Spartanburg County upon the plead-
ings and testimony.    Its issues were partly decided in favor
of the plaintiff and partly in favor of the defendant.    Con-
sequently both sides appeal from the judgment, and these
appellants we now have with us.    Briefly stated, the history
of the action is as about as follows: The plaintiff is a bank
at Union.    The defendant is a cotton factory in Spartan-
burg County, in this State.    For a number of years, begin-
ning with the year 1888, the defendant has had T. S. Fitz-
simons as its agent to deposit its money to the credit of The
Clifton Manufacturing Company, T. S. Fitzsimons, agent,
in the plaintiff bank, for the purpose of purchasing and pay-
ing for cotton to be shipped to it from Union by its said
agent.    From the beginning of the business connection of
plaintiff and defendant, the business of the defendant has
been solely managed by T. S. Fitzsimons.    He deposited
all the money in the bank; he drew therefrom by his checks
all the money so deposited.    Such agent, from the very first,
began a series of overdrafts in his accounts at the bank.
This was acquiesced in by the bank, and was well known to
the officer of the defendant, who had entire charge of the
agent, T. S. Fitzsimons; sometimes these overdrafts would
amount to $23,000, $15,000, $12,000 and so on.    The de-
fendant, as soon as, or very soon after, the overdraft was re-
ported to it by its agent, Fitzsimons, would cover the same
by New York exchange, or very frequently by checks on the
plaintiff bank, drawn payable to its agent, T. S. Fitzsimons.
Each year, at the close of the cotton season, the accounts be-
tween the plaintiff and defendant would be balanced, until
the year 1896-1897.    After January 12th, 1897, the defend-
ant learned that its trusted agent had failed to keep his busi-
ness ventures from those of his principal, and thereby had
diverted some thousands of dollars of his said principal's
money to his speculations in cotton futures, and in the man-

agement of the business of the defendant with the plaintiff bank, a debt of $3,384.30 was left charged against said defendant as overdraft. This suit is to recover that sum. But the defendant denies its liability to make good such overdraft, and, in addition, charges that an accounting, which it demands of the plaintiff, will disclose that the plaintiff allowed the defendant's agent to use something more than $1,750 of defendant's money deposited in the plaintiff bank to speculate in cotton futures, when such bank well knew that the defendant's agent was diverting such funds from the lawful purposes of their deposits, &c., or ought to have known such fact. As we before remarked, each side has appealed from Judge Klugh's decree or judgment, and it remains for us to dispose of these exceptions. We will state these exceptions, beginning with those of the plaintiff, which are:

"The plaintiff excepts to the decree of his Honor, Judge Klugh, filed October 11, 1898, in the above entitled case, respectfully alleging error in the following particulars, all of which will be relied upon as its grounds of appeal: In holding that Fitzsimons, as agent, was not authorized or empowered to draw post-dated checks, and that authority to draw present-dated checks did not authorize post-dated checks. 2. Having found as a fact that Fitzsimons, as agent, was authorized 'to make overdrafts and to buy cotton on time,' his Honor erred in not holding that the purchase of cotton on time, secured by means of a post-dated check, was binding on his principal, and so was the post-dated check. 3. In not holding that a post-dated check, on and after the day of its date, was the same as a present-dated check; that a bank with funds was bound to honor it, and that an overdraft created by its payment stood upon the same footing as any other overdraft—and this whether the drawer was the principal or an agent with authority to draw checks on his principal's account. 4. In properly finding that the Clifton Company received and used the cotton for which the seller was paid through the bank, and yet holding that defendant

was not liable to plaintiff for the money which procured it. 5. In not giving plaintiff judgment for $3,384.39."

"The defendant excepts to the decree of his Honor, Judge Klugh, filed October 11th, 1898, in the above stated case, and will ask that said decree be modified in the particulars hereafter mentioned upon the grounds, as it is respectfully submitted, that the Circuit Judge erred: 1st. In not finding and holding that T. S. Fitzsimons never at any time bought cotton to be paid for at future times or on credit, except during the latter part of the season of 1896, when he bought from the parties whose claims are now disputed by the defendant company. 2d. In not finding and holding that the defendant company never at any time knew or approved of any purchase of cotton made by T. S. Fitzsimons except cash purchases made by cash checks drawn on its account. 3d. In not finding and holding that while there were large overdrafts made by T. S. Fitzsimons on defendant company's account during the years prior to the season of 1896, which were known to defendant company, the overdrafts for the season of 1896 were not known to the defendant company, and, on the contrary, that said company was informed at the beginning of the season that the plaintiff bank would not allow such overdrafts during said season; and that the defendant instructed the said Fitzsimons during that season not to make any overdrafts, and in this connection in not sustaining defendant's exceptions to the master's report, which complained against the ruling of the master in excluding letters written by W. S. Manning to T. S. Fitzsimons, dated September 16th and October 3d, 1896. 4th. In not finding that the officers of the bank had positive knowledge prior to the season of 1896, and during that season, that T. S. Fitzsimons had used and was then using the funds, which he was at liberty to draw on through plaintiff's bank, improperly for his own purposes. 5th. In not finding that the terms upon which the defendant company's account was entrusted to plaintiff bank, so far as T. S. Fitzsimons was concerned, were that the bank was only to pay such cash checks

as Fitzsimons should draw for the purchase of cotton.    6th. In not sustaining the defendant's first exception to the ruling of the master, which complained of error in admitting, against defendant's objection, letters written by T. S. Fitzsimons to A. H. Twichell from 1888 to 1897.    7th. In not sustaining defendant's second exception to the report and rulings of the master, which alleged error in admitting the testimony of J. L. McWhirter as to a transaction between said McWhirter and Fitzsimons.    8th. In not finding and holding that from the positive knowledge the plaintiff bank had of the misappropriations of the defendant's money in its charge during the seasons of 1893-4, 1895-6, 1896-7, and from its knowledge of the many suspicious acts and circumstances surrounding the manner in which Fitzsimons drew upon defendant's account during the season of 1896, it was bound in law to refuse to honor such checks, or to inform defendant company thereof; and having failed to do so, plaintiff bank is not entitled to have credit for any checks drawn during the said season of 1896 which were used by Fitzsimons in so misappropriating defendant company's fund in its charge.    9th. In not holding that even if the plaintiff bank, during the season of 1896, did not have actual knowledge that this appellant's agent intended to misappropriate large sums of money he then drew from it by checks; the knowledge that the bank did have of the said agent's action, which was shown by the undisputed evidence was sufficient to put a reasonable man upon inquiry as to the intention of the said agent, and that the failure of the bank to take such steps as were necessary to prevent such misappropriations, and its continued payment of checks intended therefor, was in law a breach of trust on its part; and that for this reason the plaintiff bank should not be allowed credit in its accounting with the defendant for any check by and through which such misappropriations were made.    10. In not holding that, so far as the defense which the defendant sets up in this action is concerned, by which it seeks to have an accounting with the plaintiff and asks judgment on its counter-claim, it

is equitable in its nature, and so considering the issues raised, in not holding that the plaintiff is liable to the defendant for the full amount alleged to be due on said counter-claim. 11th. In holding that there was nothing to put the plaintiff bank upon inquiry as to the various checks drawn by Fitzsimons intended to misappropriate the defendant's funds, and that the said checks were and should be considered valid in the account between the plaintiff and defendant. 12th. In not holding that the check for $930, drawn by Fitzsimons in favor of Nicholson and Son on December 24th, 1896, and not paid until 30th of December, 1896, was, under the circumstances and when paid, in law a stale check—one that defendant company could not have beeen held liable on—and that plaintiff was not entitled to credit for the sum paid out for said check. 13th. In not holding that the plaintiff should not be allowed to recover for the said check of $930, for the further reason that it was paid when stale, to a party who knew, or had strong reasons to know, of the misappropriation of defendant's funds; and that the plaintiff bank in paying it off took the said check subject to all the defenses defendant company had against the same. 14th. In not holding that the plaintiff bank should not be allowed to recover for the said $930 check, for the further reason that even if the bank had not previously known of the conduct of T. S. Fitzsimons, it had knowledge when it paid the said check of such circumstances as should have prevented such payment. 15th. In holding that it would be against good conscience for a cotton mill to procure cotton through the unauthorized act of its agent, then repudiate the act of its agent, and refuse to pay the owner, and yet retain the cotton, when no such question arose or was presented for decision, under the facts of this case; and in not holding that even in an action such as that supposed, a purchaser of cotton can in no case be held liable for an unauthorized act of its agent, unless such act has been ratified; and that the facts and circumstances of this case do not show any such conduct on the part of the defendant company as would, even in the case sup-

posed by the Circuit Judge, amount to such ratification, and make the defendant company liable. 16th. In not ruling and holding that the plaintiff should not have judgment against the defendant for any sum whatsoever, but that the defendant should have judgment against the plaintiff on its counter-claim for $6,700. 17th. In not ruling and holding that even if plaintiff is entitled to a judgment against defendant for $1,085.16, such sum should not bear interest, and in allowing plaintiff interest thereon."

In our disposal of the questions raised, we will consider those exceptions relating to the competency of certain testimony. The defendant complains that it was not permitted to prove its directions, communicated through W. S. Manning's letter to T. S. Fitzsimons, dated respectively September 16th and October 3d, 1896, when such directions were never communicated to the plaintiff. The effort of the defendant by this proffered testimony was to break the force and effect of its dealings with the plaintiff for eight years, by introducing a direction to its agent, which was never communicated to the bank or any other person than its agent, Fitzsimons. This testimony was objectionable upon two standpoints. It does not appear that W. S. Manning had any relation to the defendant which would warrant any directions being communicated through him to the agent, Fitzsimons. Again, there was no relevancy in any testimony purporting to give directions by the defendant to its agent, unless such directions reached the plaintiff. There is no error here.

The defendant also complains (its sixth exception) that it was error to admit in evidence all letters written by T. S. Fitzsimons to A. H. Twichell from the year 1888 to January 2, 1897. Mr. Twichell was the officer of the defendant who controlled for it the agent, Mr. Fitzsimons. In the answer of the defendant there was a clause which seemed to negative all knowledge by the defendant of overdrafts in its account with the plaintiff bank controlled by its agent, Fitzsimons. It became important to show that

the defendant, from the very first year of its business connection with the plaintiff bank, had knowledge derived from its agent, Fitzsimons, of overdrafts, frequent in occurrence and of considerable magnitude; that such agent in one of such letters had reported to the defendant that Mr. Wallace, as president of plaintiff bank, had said in 1890 that as long as money was so tight as it was at that time, overdrafts would not be permitted, and that notwithstanding such letters such overdrafts did continue. Besides, it comes with ill-grace from the defendant to complain of the admission of these letters in testimony, when it relies upon one of such letters, written to Twichell by Fitzsimons in September or October, 1896, wherein it was stated that Mr. Jones, president of plaintiff bank, would not permit overdrafts, to sustain the proposition that overdrafts were not allowed during that year. We think the letters are competent. The exception is overruled.

Lastly, in this branch of the case occurs the seventh exception, which complains that it was error to allow the testimony of J. L. McWhirter as to a transaction between said McWhirter and T. S. Fitzsimons. McWhirter was defendant's witness, and while examined for defendant in chief, the witness had testified that he bought cotton for the defendant mill in the season of 1896-1897, and that Mr. Fitzsimons sent the money to him with which to pay for cotton, or placed such money to his, McWhirter's, credit in plaintiff bank, and that the amount received from Mr. Fitzsimons up to 2d November, 1896, was $5,786.53. On the cross-examination plaintiff asked the witness: If in January, 1897, there was not money owing to him on account of cotton purchased for Clifton Mills at direction of Mr. Fitzsimons, their agent? This testimony was objected to. We think the testimony was competent, for the defendant had led the way to such testimony by its examination of this witness, proving that he purchased cotton for defendant under control of Fitzsimons. Besides, the question was preliminary to the inquiry as to the check given on plaintiff

bank by·defendant's agent, Fitzsimons, to cover the very cotton accounts in question, which check was denied payment by the bank, being presented after 14th January, 1897, but which check, the witness testified, was afterwards paid by the defendant mill. The exception is overruled.

We will now pass upon the questions underlying the remaining exceptions, those of plaintiff and of defendant. In the brief history of the action it was stated that the judgment or decree of the Circuit Judge was partially in favor of the plaintiff and partially in favor of the defendant. By this language we meant to say that the plaintiff was only allowed judgment for $1,085, and interest thereon from 14th January, 1897, and that the defendant was not allowed judgment for its counter-claim of $6,750, but its objection to the sum of $2,799.23, for which plaintiff claimed judgment, was sustained. The suit of plaintiff was really based upon three items, viz: one for expenses which aggregated $154.59, another for a check paid to Wm. A. Nicholson & Son for $930.57, and another for the sum paid on the check of defendant in favor of R. W. Harris for $2,299.23. The Circuit Judge, speaking of the first item, that for $154.59, says: "To the first item there appears to be no objection," but in the 16th exceptions of defendant we understand that he includes this item of $154.59 in his objection, so that we must pass upon this as well as the other two items. Underlying these three items and the counter-claim of $6,700, preferred by the defendant, a very interesting discussion has arisen. In the first place, defendant would insist that plaintiff should be allowed no claims against it arising out of any overdrafts in its account with the plaintiff bank, because notice was given by the plaintiff to the agent of defendant that such defendant would be allowed no overdrafts during the season of 1896-1897. This contention of defendant is based upon the declaration of such fact by T. S. Fitzsimons in his letter to A. H. Twichell. Mr. Fitzsimons in his testimony declares that Capt. Farr, as the president of the plaintiff bank, so declared to him at the beginning of the cotton season in 1896-

1897, and that he (the witness) apprised Mr. A. H. Twichell, as treasurer of defendant mill, of that fact. That this is not true, reference has but to be made to the testimony of the president and cashier of the plaintiff bank, and the further fact that overdrafts obtained after September, 1896, till the close of the business of defendant with plaintiff, which overdrafts were the direct work of the hands of said Fitzsimons. Again, it is urged by the defendant that the very method by which business relations were began by the defendant with the plaintiff shows that its account with the bank looked to the purchase of spot cotton by its agents from its funds on deposit in the bank, and it now states, while it had knowledge of overdrafts, yet such were not by the direction and authority of defendant. When the defendant opened business with plaintiff, the following letters were written :

"The Clifton Manufacturing Co. Cotton Mills, Clifton, S. C., September 25th, 1888. E. R. Walker, Esq., President, Union, S. C. Dear Sir : I enclose for deposit check on Park Bank $10,000. Mr. Theo. S. Fitzsimons will be our cotton buyer in your market and will draw against our account for his purchases. We open the account in our name instead of his, as I may wish to buy cotton independent of him. * * Yours truly, A. H. Twichell, Treasurer."

"The Clifton Manufacturing Co. Cotton Mills, Clifton, S. C., September 28th, 1888. E. R. Wallace, Esq., President, Union, S. C. Dear Sir : Yours received. The plan you propose for keeping two accounts with you is exactly the same as I do at Spartanburg; but I thought it might be more trouble to you. I will keep an account distinct from Mr. Fitzsimons' cotton account, and will send him checks on our account for deposit on his cotton account. Yours truly, A. H. Twichell, Treasurer. Clifton Manufacturing Co., A. H. Twichell, Treasurer. Clifton Manufacturing Co., T. S. Fitzsimons' cotton account."

The same arrangement was continued for the cotton season of 1889-1890, 1890-1891, 1891-1892, 1892-1893, 1893-

1894, 1894-1895, 1895-1896, 1896-1897. In the "Case," copies of the account between plaintiff and defendant for each of these years appear. An inspection of such accounts shows that each and every year from 1888 through 1897 (12th January), overdrafts were the rule. Letters from Mr. Fitzsimons to Mr. Twichell show that the latter was apprised of those overdrafts—so much so that Mr. Fitzsimons felt called upon, on 22d November, 1890, to apprise his principal that the arrangement of overdrafts would have to be suspended *"while the squeeze in the money market lasted."* His exact language in this letter to Mr. Twichell is: "Mr. Wallace (president of the plaintiff bank) said to tell you that he could not carry overdrafts now while the squeeze in the money market lasted." The Circuit Judge found as a fact "that his (Fitzsimons') account at the bank was very frequently overdrawn, and often in large amounts, continuing and increasing for several days at a time, and that he did many other acts not strictly within the scope of his employment as an agent to buy spot cotton for spot cash. His employees did not disapprove of those acts and dispositions of his, but they rather, by their recognition and acquiescence and the acceptance of the result, ratified and authorized them. The overdrafts on the bank account, as often as they occurred, were covered by The Clifton Company, and the bank—while at times objecting to them even to the extent in two or three instances of refusing to pay them—still allowed them, and they became one of the commonest features of the course of dealings between the two corporations." From all these matters we are inclined to hold with the Circuit Judge that overdrafts at the bank were the rule with this agent, whose conduct, except in the year 1896-97, was known by the defendant and ratified by it. But, in this connection, the defendant insists that up to the beginning of the last cotton season, to wit: that of 1896-97, the conduct of its agent as to overdrafts may have been known and ratified by it, yet that when the president of the plaintiff bank communicated through its agent, Fitzsimons, to the defendant com-

pany that overdrafts would not be permitted during the cotton season of 1896-97, that a new relation was established between the two corporations, by which new relation "spot cotton for spot cash" was to obtain. As we have heretofore remarked, this is not in accordance with the testimony of the plaintiff's witnesses, who were its officers. They both deny that any such direction was given, and they point to the fact that this very agent, Fitzsimons, carried on the old habit of overdrafts as much in 1896-97 as he had done in the past eight cotton seasons. We must agree with the Circuit Judge that, so far as the first item of $155 is concerned, that the defendant is liable to pay this item.

We will next examine the $930 check drawn by the defendant through its agent, Fitzsimons, payable to Wm. A. Nicholson & Son. Of course, so far as this, the second, item in the overdraft is affected by the preceding objections, we declare it also free from objection. But it is claimed that it was a *stale* check, because it was drawn on the 24th and only paid on the 30th of December, 1896. We must confess our surprise that the lapse of a few days during the "Christmas holidays"—say six days—from the date of a check to its payment, should be construed as rendering such a check a stale check. The decree of the Circuit Judge on this point is in these words: "The second item of $930.57 has the following history: One Pagan was Fitzsimons' subagent for buying cotton at Shelton. He drew on Fitzsimons for $1,100 to pay for some thirty-odd bales of cotton. The draft was made through the bank of Nicholson & Son. In payment of the draft Fitzsimons gave the check for $930.57, dated December 24th, 1896. There seems to have been some question as to the plaintiff bank paying this check, but it was paid on December 30th, 1896. The cotton so paid for was not shipped to Clifton, but to Pacolet. Here every circumstance of the transaction shows it to have been within the limits of the agent's authority, except that the cotton was not shipped to Clifton. This last circumstance was not known to the bank, and could not have been discovered ex-

cept by extraordinary inquiry.  The defendant argues that the check having been drawn on the 24th and not paid until the 30th, made it a stale check, and that the bank was especially put upon inquiry by that fact.  If a check six days old is ever to be regarded as stale, and there may be cases which would make it so (see 2 Morse on Banking, pages 441, 443), the facts in regard to the one in question do not bring it within that class.  It was drawn on Christmas Eve, at the beginning of the season when business is suspended for a greater or less period everywhere, and this circumstance alone might well cause the brief delay in payment  But it appears that there was some hesitation on the part of the bank, for the reason that the president did not like to allow overdrafts, and this led to an interview between him and Fitzsimons in reference to this very check.  Doubtless the facts in regard to the transaction were then as fully made known by Fitzsimons as they could have been discovered by the most thorough and searching inquiry by the bank, and they seem to have satisfied the president of the bank, for the check was paid.  The cotton seems to have been shipped from Shelton and not from Union, and the fact that it was or was not received at Clifton could not have been the subject of inquiry to the bank, unless it was satisfied that Fitzsimons was absolutely untrustworthy.  I think the defendant is bound to pay this check."  We are quite satisfied with the conclusion reached by the Circuit Judge as to this second item.

We will now examine this third item, to wit: the check drawn by Mr. Fitzsimons in the name of the defendant mills on the plaintiff bank in favor of R. W. Harris for the sum of $2,299.23.  It is this check which has called forth the best powers of the attorneys on each side of this controversy. It is suggested by the appellant, the plaintiff, that the Circuit Judge having found as facts to control in this case that the matter of overdraft in his accounts with the plaintiff bank was well known by the defendant to be the habit of its agent, T. S. Fitzsimons, and that the de-

fendant always ratified such overdrafts by time after time paying them up, without one word of dissent thereto by the defendant to the plaintiff, and also that this check to R. W. Harris was given for cotton purchased by the said Fitzsimons for the defendant, and that such said cotton was shipped to, received by and used by the defendant mills, ought to have gone forward and found the defendant liable to pay this check. The defendant suggested to the Court that the plaintiff bank had knowledge of enough facts in the business life of the defendant's agent, Fitzsimons, to have put said plaintiff bank on strict inquiry, so that it would not have paid this check drawn in an irregular way, and, further, it suggested that the plaintiff had no right to pay a post-dated check and charge the same to the account of the defendant mills. It is always well to remember, when it is charged that a duty is owed by one to another for the breach of which duty a legal liability may be said to exist, how the duty is said to have originated. In this connection, it is suggested that the letters of Mr. A. H. Twichell, dated September, 1888, addressed to the president of this bank, wherein Mr. T. S. Fitzsimons is brought to the bank's attention as the trusted agent of the defendant mills : that from the last day of September, 1888, up to 13th January, 1897, not one word or not one act intimated that the defendant mills had lessened in their appreciation of the entire trustworthiness of their agent. The defendant placed it in the power of their agent to draw every dollar on deposit to the account he managed for the defendant originally; nor at any other time during the business relations of plaintiff and defendant was there any restriction placed upon the power of this agent to draw those funds. No such restriction having been made or suggested by the defendant upon the power of its agent to draw checks upon said account, unless the bank had positive knowledge that a fraud, such as a breach of trust, was being attempted by the agent, the bank was bound to honor any checks he might draw. *Knobelock* v. *Bank,* 43 S. C., 233; *Simmons & Co.* v. *Bank of Greenwood,* 41 S. C.,

22—56

177; *Fogarties & Stillman* v. *State Bank,* 12 Rich., 518. Furthermore, it must be remembered that no bank is made to exercise inquisitorial functions with its depositors. If knowledge comes to the bank that any agent, who is allowed to check upon the funds of his principal on deposit with it, is about to commit a breach of trust in drawing checks upon the fund in bank, of course, in such an event, it would be the duty of the bank to protect the rights of the principal; but to acquire this knowledge such bank will not be required to exert itself beyond the channels of its business. To hold a bank to a higher duty than that of being bound within the channels of its business in acquiring information of any projected breach of trust by an agent who has the power to check all the funds of the principal from the bank, would imperil the banking interests of the country. In the case at bar, as far as the testimony went, in the year 1893, the bank had heard of a loss to Fitzsimons in a cotton speculation, which loss was made up by the assistance of some of his relatives. So far as Fitzsimons' conduct in the year 1896-97 was concerned, prior to 13th January, 1897, there was no testimony which brought home any knowledge to the bank officials of anything in the conduct of defendant's business by Fitzsimons which would necessarily or even likely attract the attention of any wrong-doing on his part. The testimony showed that he had been in the habit of having subagents to buy cotton both at Union and at Santuc, and at Jonesville, in that county, and it was his habit in supplying McWhirter, his agent at Jonesville, with funds, to deposit money to McWhirter's credit in the plaintiff bank, or to draw money and send it by express, or even carry it to Jonesville for him. It was from Jonesville that he (Fitzsimons) secretly, in the name of another innocent young man, sent the money he drew, ostensibly for McWhirter, to persons in New York to pay on cotton future speculation. We agree with the Circuit Judge that there was nothing in all these matters to justify the defendant's position as to notice of guilty knowledge by the bank.

Then we come to consider the matter of the check being post-dated. Now, in connection with the post-dating of this check payable to R. W. Harris for $2,299.37, it is important to always remember that the cotton which was covered by this very check was actually received and used by the defendant mills. So that it was not the case of a post-dated check enabling this agent of defendant to swindle his principal out of the thing which was procured by the post-dated check. After all, what is a post-dated check? It is one which is knowingly dated in the future, and is thus distinguished from a check drawn on the day it is given. If there is money on deposit when it is presented, it must be paid. In this instance the defendant, through its trusted agent, in order to purchase a lot of cotton from R. W. Harris, with consent of the bank, gave said Harris a post-dated check to be used, or cashed, on the 12th January, 1897. Under this post-dated check the defendant received the cotton whose purchase price was set out in said check. Now, can a person claim the fruits, or benefits, of a check which are fully equal to the figure named in the check, and then repudiate the liability to pay such check? *Townes* v. *City Council of Augusta,* 46 S. C., 15. The money which the agent of the defendant appropriated to his own purposes had been taken some time before this lot of cotton was bought from R. W. Harris. The post-dated check has no earthly connection with such misappropriation. So that we think the Circuit Judge erred when he refused to hold the defendant mill responsible to the plaintiff for this sum of $2,299.37.

It remains now to dispose of the claim of defendant that in equity and good conscience the plaintiff bank should make up to the defendant the $6,700 it claims to have lost for and on account of said bank's remisness in allowing the defendant's agent to check out from the bank $6,700, which was checked out for the purpose and actually used by the said Fitzsimons in his own ventures, to wit: in the purchase of cotton futures in the city of New York. This is set up by defendant as a counter-claim, and in dispos-

ing of it the Circuit Judge uses this language: "A counter-claim set up by the defendant against the plaintiff for the amount of defendant's funds that were misappropriated by Fitzsimons. It is not disputed that large sums of the company's money were drawn from the bank and misapplied by Fitzsimons in the fall of 1896, and the company suffered loss thereby to the extent of several thousand dollars, but it is not pretended that the bank received any benefits either direct or indirect from his dishonesty—not that there was any positive bad faith on its part toward The Clifton Company in allowing him to draw the money. It is not even claimed that the bank, or any of its officers, actually knew that any part of this money was being misapplied. The contention is that the bank through its officers knew that Fitzsimons speculated in former years, and knew, or had reason to suspect, that he wrongfully used his employer's money; that it negligently and wrongfully failed to communicate this information to The Clifton Company; also that it knew, or had reason to suspect, that he was pursuing the same improper practice in 1896, and neglected to impart its knowledge or suspicions to the said company, as it was its duty to do; that Fitzsimons was only authorized to draw checks for the purchase of cotton for cash, and all other checks drawn by him were unauthorized and not binding on the company; that the defendant is entitled to an accounting with the plaintiff upon which all checks so improperly drawn must be excluded, and to an investigation of plaintiff's neglect of duty as alleged, and to have judgment against the plaintiff for such amount as was thus negligently paid out and lost to the company. It is not quite clear whether the cause of action relied on in the counter-claim lies in tort for damage resulting from the plaintiff's alleged negligence—the measure of damage being the amount of defendant's funds misapplied and lost by Fitzsimons—or in contract, for the balance on the account which would appear in the defendant's favor if all checks drawn by Fitzsimons for other purposes than the legitimate use in his employment as The Clif-

ton Company's cotton buyer were eliminated. If it be considered to be for the alleged tort, then the claim would be stated thus: that the defendant deposited money with the plaintiff to be drawn by its agent for a sole express purpose; that it was the plaintiff's duty to see that no part of said money was drawn out for any other purpose, or misapplied when properly drawn out; that plaintiff neglected to perform its duty in that regard, and in consequence damage to the defendant ensued. Any damages claimed as resulting from plaintiff's neglect to report the agent's unfaithfulness, or from negligently paying improper checks in prior years to 1896, are manifestly both speculative and remote. It would be pure conjecture to surmise as to what The Clifton Company would have done had the bank reported that Fitzsimons, in 1893, for instance, was, or that it suspected from certain circumstances that he was, speculating, or that it believed that he was drawing out money for other purposes than the purchase of cash cotton. If upon such information the company would have investigated for itself, and on finding the bank's suspicions well founded, have discharged him and never employed him again, then the loss of 1896 would, of course, not have occurred. But it is impossible to say the company would have done this. Mr. Twichell, the treasurer of the company, who had the entire control of Fitzsimons as its cotton buyer, testifies that if he had known in 1896 that Fitzsimons was drawning post-dated checks, he would have sent for him, and put a stop to it. It is not unfair to assume that had he known of any other unauthorized drafts on the company's funds, either in 1896 or any prior year, no loss having up to that time ensued, and Fitzsimons being regarded as a valuable and trustworthy servant, he would have treated the matter in the same way, simply have put a stop to it by forbidding it, and the agent would still have been held in a position to resort to other methods of abusing his trust. Again, no loss ensued in former years from the company's ignorance of its agent's unfaithfulness, nor from the bank's negligence in paying improper checks, and, therefore, no

damage could be predicted thereon.   The transaction prior
to 1896, can, therefore, give no support to this counter-claim,
viewed as an action for a tort.   Neither, indeed, can they, if
it is regarded as a claim for the balance due upon the ac-
count; for the account was balanced each year, and no loss
appears until the year 1896 and 1897.   The transactions of
these five years are instructive, however, as showing the true
relations between the several parties, The Clifton Company,
Fitzsimons as its agent, and the bank.   Granting, then, that
the duty of the bank was, at the beginning, as claimed by the
defendant, to pay out the company's money only on its
agent's checks for the immediate payment of cotton
bought at the instant of drawing each respective check,
then it must be also granted that the agent's authority
was equally narrow; and that if his authority was
broadened or the stringency of his instructions were relaxed
by the company, either expressly or by implication, then
the bank not only had the right, but must necessarily cor-
respondingly relax the tension of its duty, if it was to still
serve the purpose for which The Clifton Company had
chosen to use it.   Thus, if the company allowed its agent,
instead of rigidly paying spot cash for cotton, and ceasing
to buy the moment he drew the last dollar out of the bank, to
exceed these limits by overdrawing the account for the pur-
chase of cotton, the bank had the right to assume that the
company would be responsible for the overdrafts.   If the
agent was allowed to employ subagents at the different sta-
tions along the railroad to buy cotton, the bank had the right
to assume that the money drawn out by him to supply these
subagents was properly drawn, and it had authority to pay
the checks for this purpose.   Now that these and similar
practices became a part of the established course of dealing
between the parties, is clearly shown by the testimony.
When such becomes the case, the bank had the right to as-
sume that it would continue, especially as The Clifton Com-
pany for several years and, so far as appears to the contrary,
every year, reopened its account with the bank expressly 'on

the same terms as last year.'   The defendant does not make good its claim, then, that the bank had authority only to honor Fitzsimons' check to pay for cotton bought on the spot.   Neither can the position be sustained that the bank was bound to see that no part of the defendant's funds were misapplied by its agent.   In the first place, he was introduced to the bank as an honest, trusted agent of the defendant, and by its conduct, as we have seen, he was held out as having large latitude in the management of the business confided to him.   The bank had the right to presume, then, that any check drawn, any act done, or statement made by him in the apparent ordinary course of his employment, was in good faith and authorized by his principal, and only actual knowledge of strong evidence to the contrary would have warranted the opposite conclusion by it.   It is not claimed that the bank had actual knowledge that Fitzsimons was misapplying The Clifton Company's money during the fall of 1896.   The only suspicious circumstance which appears to have arrested the attention of any officer of the bank that season was a draft for $200 on New York, which was procured during the month of November from the cashier, and that officer testifies that the thought occurred to him from the fact of its being a round sum, that it was for cotton futures.   He knew that Fitzsimons' salary was $1,200, and he might well have concluded that the check, though drawn on The Clifton Company's account, was Fitzsimons' own money; besides, it seems that Fitzsimons did sometimes draw checks for New York exchange in the course of his employment as The Clifton Company's agent.   This one incident was not sufficient to put the bank on notice that Fitzsimons was making an improper use of his employer's money. Again, there is no proof that the bank was bound to inquire into the purposes for which Mr. Fitzsimons used The Clifton Company's money, or that its obligation was different from that ordinarily assumed by banks in receiving on deposit under similar circumstances.   To say that it was its duty to inquire into the specific application of the proceeds of each

check drawn by this agent, would be to impose upon it an intolerable burden, which would soon drive it out of business. Of course, it could have bound itself by a specific agreement to do this, but there is no proof of any such agreement. For gross carelessness or participation in the agent's fraud, the company would have the right to hold the bank liable, but the testimony gives no support to a contention like this. I conclude that the evidence does not sustain the counter-claim on the ground of the plaintiff's negligence. Can it be sustained on the ground that there is a balance due the defendant on the account? The Clifton Manufacturing Company deposited its money with the bank in accordance with a long established course of dealing between the two, to be drawn out by its agent, for purposes defined by a like long course of employment, from which, together with the company's express instruction, the bank was informed of the agent's authority. Checks drawn by the agent within the scope of his authority were valid, and the bank had the right to assume that all checks drawn by him were authorized, unless it knew, or had strong reason to believe, the contrary. If it paid any check that it knew, or had good reason to know, or ought to have known, was drawn in excess or in violation of the agent's instructions, then said payments were not binding on the defendant, and are not proper credits in favor of the bank against the deposit. Now, the funds of the company that were drawn by Fitzsimons and sent to New York or elsewhere for the cotton speculation in the fall of 1896, were principally, if not entirely, drawn out from the bank by means of the checks in favor of McWhirter or other sub-agents, and those in favor of Nicholson & Son. We have seen that these were all apparently of the same character as checks formerly drawn by him and approved by Clifton Company, and there was nothing to indicate to the bank that they were unauthorized. We are bound, therefore, to conclude that, so far as the bank was concerned, they were valid checks and proper credits in its favor on the account. The counter-claim must, then, be disallowed." Thus has the Cir-

cuit Judge disposed of this so-called equitable counter-claim. We agree most heartily in the conclusion reached by him in this matter. We do not know that we can add anything to the reasoning employed by the Circuit Judge in coming to his conclusion. However, we cannot resist the inclination to say that with all these findings by the Circuit Judge, along with others in the decree, it is difficult for us to see how the Circuit Judge failed to sustain plaintiff's claim to the Harris check for $2,299.37.

Before closing the opinion, we may remark that we have not passed upon the claim of one side that this is an action on the law side of the Court of Common Pleas, and, in the other side, that it is an action on the equity side of that Court— for it seems of no consequence whether it is law or equity. All the findings of fact in the Circuit decrees are in favor of the plaintiff. The plaintiff only claims that a few of the conclusions of law of the Circuit Judge are erroneous. This Court could only, in that case, review errors of law set up by the appeal. If, however, it is an action on the equity side, then this Court is fully empowered to review alleged errors of law and fact, and we are satisfied with all such findings of fact. Thus it appears that it is immaterial whether the action is in law or equity. Having disposed of all the issues herein involved, although we have not specified exact exceptions to which our views apply, yet we have considered each one, and as the result of our labors we have sustained the exceptions of the plaintiff, and overruled each exception of the defendant, and our reasons therefor are mainly stated herein. We use the words "mainly stated," so as to let it be known that some reasons are necessarily implied from those expressed.

It is the judgment of this Court, that the judgment of the Circuit Court be so modified that the plaintiff shall be allowed judgment against the defendant for the sum of $3,384.39, with interest from the 12th day of January, 1897, instead of the sum of $1,085.16, with interest thereon from 12th January, 1897, up to the date of the decree of the Cir-

cuit Judge, which, as stated by him, was $1,218.    Let the
action be remanded to the Circuit Court.

Petition for rehearing was filed August 1, 1899, and or-
der passed staying remittitur.    On November 29,
1899, the petition was refused and remittitur or-
dered down: