### GLENS FALLS INDEMNITY CO. v. PALMETTO BANK.

District Court, W. D. South Carolina, Greenville Division.

June 29, 1938.

846

J. B. S. Lyles and Cooper & Maher all of Columbia, S. C., for plaintiff.

R. E. Babb and Blackwell, Sullivan & Wilson, all of Laurens, S. C., for defendant.

WYCHE, District Judge.

In this action plaintiff seeks to recover from the defendant $15,840.80, the net amount of a loss sustained by Watts Mills resulting from an embezzlement by C. S. Link, Jr., its secretary and assistant treasurer. The loss is alleged to have been proximately caused by the defendant in wrongfully cashing forty-six checks payable to Watts Mills. The embezzlement was covered by plaintiff's fidelity bond to Watts Mills. Plaintiff paid the loss and acquired all rights of the mill against the bank by subrogation. Rivers v. Liberty Nat. Bank, 135 S.C. 107, 133 S.E. 210.

The testimony, about which there is little dispute, is substantially as follows: The defendant, Palmetto Bank, at the times pertinent to this controversy, was a banking corporation, organized under the laws of South Carolina, and was engaged in the banking business in the town of Laurens in this State. Watts Mills is a corporation created under the laws of this State, and was engaged in the cotton textile business near the city limits of the town of Laurens. R. E. Henry was its president and treasurer and lived in Greenville, South Carolina, some thirty-five miles from Watts Mills. He visited the mill once or twice each week. He was also president of several other mills. C. S. Link, Jr., the secretary and assistant treasurer of the mill, resided in Laurens and was the active executive in charge of the office of the mill in the transaction of all of its business, except that of dealing with its New York selling agent. The by-laws of the mill provided, amongst other things, "That the President and Treasurer is hereby authorized to borrow money, to give the notes of the company for same and to sign checks and drafts on any bank with whom the corporation may have dealings. That he is further authorized to open and close accounts with any bank or trust company at his discretion, and shall have the power to contract debts and incur liabilities in behalf of the company as he may find it necessary to properly conduct the business of same." The board of directors at its meeting of February 9th, 1927, passed the following resolution: "Since the By-Laws of the company provide that the duties of the Assistant Treasurer shall be prescribed by the Board of Directors, the following Reso-

lution was offered and duly seconded: 'Resolved, That the Assistant Treasurer shall act under the President and Treasurer as a general assistant to that officer and the Assistant Treasurer is hereby authorized to sign checks and drafts on any and all banks with whom the company may be doing business.'"

The president and treasurer of the mill, in pursuance of the resolutions of the board of directors, delegated to Link the same authority that he had as president and treasurer of the mill. In answer to the question, "You delegated the full authority you had to Link?" he answered, "Yes, sir". Link was authorized to receive cash paid to the mill from incidental sources; had the authority to pay and paid all employees and officers of the mill in cash each week; he had the custody of the petty cash which ranged from one thousand to. fifteen hundred dollars, and on one occasion, due to the banking holiday, as much as fourteen thousand dollars; he opened and had full charge of the mail; he collected rents ranging from two to three thousand dollars per month; he was empowered to sell junk and scrap iron, and was given full authority to handle the financial affairs of the mill; and was empowered to contract debts and incur liabilities in behalf of the mill as he found it necessary to conduct the business of the same properly; he had custody of all books, records, deposit slips, checks and bank accounts; had authority to indorse checks payable to the mill and deposit the same to the credit of the mill, and for such purpose he used a rubber stamp containing the following words: "For deposit account of Watts Mills, Laurens, S. C.—C. S. Link, Jr., Assistant Treasurer"; he had authority to cash checks properly indorsed; he had supervision of all bookkeepers and clerks; he signed all the checks of the mill except when he was sick or absent; practically all the dealings with the bank were done by Link, and the printed checks used in drawing on the mill's account were signed by Link over the printed words "Assistant Treasurer"; and when Link opened the Watts Mills account with the bank the assistant cashier of the bank furnished him with a signature card which was thereafter signed by R. E. Henry, as President and Treasurer, and by C. S. Link, Jr., as Secretary and Assistant Treasurer of Watts Mills, and subsequently filed with the bank. It was the customary signature card used by corporations and individuals in opening accounts with the bank, and among other things contained the following: "Below please find the authorized signatures which you will recognize in the payment of the funds or the transaction of other business on my or our account", and opposite the signatures, the following: "Signatures and by whom made"; "either signature and only one signature necessary".

Forty-six checks were cashed by Link as a part of a clever scheme of embezzlement, successfully pursued by him over a period of about three years and two months. The first check was dated April 12, 1933, and the last one was dated June 6, 1936. All were cashed soon after their dates. Upon receipt of checks payable to the mill, Link would stamp them with the rubber stamp indorsement "For deposit account of Watts Mills, Laurens, S.C.—C.S. Link, Jr., Assistant Treasurer". Generally, he would make a true deposit of such checks. At times, however, he would request the bank to pay him cash upon a check so indorsed, and upon the bank's complying with his request, he would embezzle the amount so paid to him. Afterwards, he would place a false deposit slip in the records of the mill, showing that he had deposited in the bank the check upon which he had received the cash. He would then credit the drawer of the check with the amount of the embezzlement, and actually deposit on the date the drawer was given credit, funds totalling the amount of such embezzlement, but which were received from sources not shown as credits on the books of the mill. The total on the deposit slips as found in the office of the mill by the auditors was the same total as shown by the bank's statement sent to Watts Mills each month by the bank. As long as Link was able to handle all the cash, checks and books without supervision, as he was permitted to do during the time in question, he was able to cover up this scheme. The loss was eventually discovered by an exhaustive detail audit following Link's discharge for an unauthorized absence from his duties.

The bank did not receive any benefit in cashing the checks, did not share in the proceeds, nor receive any part thereof in the payment of any obligation to the bank, nor charge any sum for services rendered. The bank had no knowledge that Link was misappropriating the mill's money, and no notice other than what was given by the form of the indorsement upon which Link received the cash.

848

■ Trial was had before me and a jury. At the conclusion of the evidence, plaintiff moved for a directed verdict in its favor for the full amount sought. Following the approved practice and with the acquiescence of both parties, I reserved my decision on the motion, and submitted the case to the jury, subject to the reservation. Brown v. New York Life Ins. Co., D.C.S.C., 22 F. Supp. 82. The jury returned a verdict for the defendant.

Plaintiff bases its motion for a directed verdict mainly upon the ground that there is no substantial evidence from which the jury could find or draw a reasonable inference that Link had authority to receive cash upon the checks after stamping the indorsement for deposit thereon.

■ Most of the business of this country is carried on by corporations. One dealing with a corporation must deal with its agents. A corporation is subject to the general principle that one who holds out another, or allows him to appear as having authority to act, as his agent with respect to his business generally, or with respect to a particular matter, cannot, as against persons dealing with him in good faith, deny that his apparent authority is real. Persons dealing with officers or agents who assume to act for such entities do not insist on being shown the by-laws of the corporation or the resolution of the board of directors authorizing the particular officer or agent to transact the particular business which he assumes to conduct. A person who knows that the officer or agent of the corporation habitually transacts certain kinds of business for such corporation under circumstances which necessarily show knowledge, or should show knowledge, on the part of those charged with the conduct of the corporate business has the right to assume that such agent or officer is acting within the scope of his authority. The public is compelled to rely upon the apparent authority of agents of such corporations, especially when, as managers or superintendents or executives, they are placed in control or in charge of the corporation's business. The fact that one has an office at the principal place of business of the corporation where its actual operations take place, that he apparently is in charge of the office and the work, that he supervises and gives orders to employees, that he opens the letters of the corporation, that he conducts its correspondence, that he signs the checks, handles the bank accounts, the cash, etc., and all the surrounding facts and circumstances may be considered and taken into account regardless of his title, in determining what his apparent authority is.

■ "The apparent scope of an agent's authority is that authority which a reasonably prudent man, induced by the principal's acts or conduct, and in the exercise of reasonable diligence and sound discretion, under similar circumstances with the party dealing with the agent, and with like knowledge, would naturally suppose the agent to have." Clark & Skyles, Agency, para. 208, citing Huffcut, Agency, para. 103.

■ Tested by these well-settled principles of law as applied to the facts in this case, I am forced to the conclusion that a reasonably prudent man, induced by the acts of Watts Mills and its conduct in placing Link in control of its finances, in the exercise of reasonable diligence and sound discretion, would naturally suppose Link to have the authority to obtain cash on the checks in the manner in question.

■ One lawfully in the possession of a check may present it for payment and payment to him will be valid, and the fact that the check has never been indorsed by the owner is of no substantial importance if the person to whom payment is made is in fact that owner or the agent of the owner to receive payment, and the payment to such owner or agent will be valid without indorsement. Zollman on Banks and Banking, Vol. 6, page 130; Modern Equipment Corporation v. Northern Trust Co., 284 Ill. App. 586, 1 N.E.2d 105; 9 C.J.S. Banks and Banking, § 341, page 684.

■ When Link received checks payable to Watts Mills he had the authority as assistant treasurer of the mill to present the checks to the bank and receive the cash without any indorsement. He had authority to stamp "Watts Mills by C. S. Link, Jr., Assistant Treasurer" on the back of the check as indorsement and to receive the cash. He had the authority to write the words "Watts Mills by C. S. Link, Jr., Assistant Treasurer" as indorsement and have the check cashed. He had the authority to indorse the checks in either way, or to use the rubber stamp for deposit indorsement and deposit the check to the credit of Watts Mills. It seems to me to follow, therefore, that Link acting as assistant treasurer had either express or apparent authority, after having indorsed the checks "For deposit account of Watts Mills, Laurens, S.C.—C.S.

Link, Jr., Assistant Treasurer" to have the bank cash the checks, thus indorsed, by verbal instructions, and thereby receive the amounts of the same in cash.

It is true that an indorsement of a check for deposit is restrictive, and vests the legal title in the bank in trust for the depositor until the time and when the proceeds are collected, and transmitted, or otherwise accounted for, unless the instrument is credited to the depositor's account and he is allowed to draw against it, but in this case the restrictive indorsement was changed by verbal instructions to the bank by Link. The bank never accepted the checks for deposit and never deposited them to the account of Watts Mills. Therefore, as far as these checks were concerned, no relationship of debtor and creditor between the mill and the bank was ever established. Link presented the checks with the deposit indorsement on them, and told the cashier to give him the cash instead of depositing them to the account of the mill. The rubber stamp indorsement was an instruction by Link as assistant treasurer to the bank to deposit the checks to the credit of Watts Mills; having the right to give this instruction to the bank by means of a rubber stamp on the back of the check, he had the authority to change the instruction verbally by requesting the cash instead of the deposit.

But plaintiff contends that the signature card was an express limitation of authority of which the bank had actual notice. It is true that where a party dealing with the agent knows the extent of the agent's powers, the principal is not bound by an act beyond the scope of the express authority conferred. It is always competent for a principal to limit the authority of his agent, and if such limitations have been brought to the attention of the party with whom the agent is dealing, the power to bind the principal is defined by the limitation. The mill did not notify the bank of any limitation of authority placed upon Link or Henry. The board of directors by resolutions did not limit the manner in which Link should cash or deposit checks. The by-laws of the corporation contained no such provisions. Link and Henry signed the signature card at the request of the bank. They, by so doing, did not attempt to limit the authority of either, but merely furnished the bank with their signatures as officers of the mill who were authorized to do business with the bank. The signature card did not, nor did it purport, to state

the extent of the authority of either Henry or Link in dealing with the bank.

A signature card is executed for the benefit of the bank to help detect forgeries, to obtain the signatures of the parties authorized to draw checks on the account at the bank and to ascertain what persons are authorized to check on the account. In this case it served a twofold purpose (1) it was to obtain the authorized signatures of the officers with whom the bank was empowered to do business, and (2) it carried by implication, at least, a representation that the individuals whose signatures were signed thereto were the authorized agents of the mill to transact any business with the bank.

The signature card is what its name imports, a card containing authorized signatures. It does not say that that is the only way in which the payment of the funds on the account could be made, or the transaction of other business on the account could be handled. Henry could have stamped a check "Watts Mills by R. E. Henry, President and Treasurer" and lawfully received the cash for Watts Mills without signing his name. Link could have done likewise and rightfully received the cash for the mill.

If plaintiff's contention is correct, then the rubber stamp indorsement "For deposit account of Watts Mills, Laurens, S. C.—C. S. Link, Jr., Assistant Treasurer" was not within the limitations of the signature card, because it was not signed by either Link or Henry; it was not, therefore, an authoritative restrictive indorsement. If this contention of plaintiff is sound, the rubber stamp indorsement was a nullity. I do not construe the signature card to mean that no business could be transacted with the bank without the signature of either Link or Henry. If this were true no money could have been deposited in the bank unless some instrument were signed by one or the other. If Link received a check payable to Watts Mills and deposited this check, this would constitute a transaction of business on the mill's account with the bank. He could have done this without signing anything.

But the plaintiff insists that Link's request to cash the checks containing the restrictive indorsements was in itself notice of improper conduct sufficient to put the bank upon inquiry, that the bank by reason of the facts surrounding the cashing of the checks had constructive knowledge that the mill's assistant treasurer was perpetrating

850

a fraud, and that the bank in cashing such checks was guilty of negligence which was the proximate cause of the loss.

It is recognized and conceded by counsel· that under the authority of Erie Railroad Co. v. Tompkins, 302 U.S. 671, 58. S.Ct. 50, 82 L.Ed. ——, the decisions of the South Carolina Supreme Court, if applicable, are controlling on this court in the disposition of the motion.

Plaintiff relies upon Rivers v. Liberty Nat. Bank, 135 S.C. 107, 133 S.E. 210. In my judgment that case is clearly distinguishable from the instant cause. In that case Rivers, as·warehouse commissioner, had employed Johnson as bookkeeper. Johnson was authorized to make deposit of checks and other funds, *but had no authority to make collection of any checks payable to the warehouse commissioner.* The bank furnished the warehouse commissioner with a rubber stamp to be used in the indorsement of checks to be deposited. The rubber stamp contained the following words (page 212): "For deposit in the Liberty National Bank of S. C., Columbia, S. C., J. C. Rivers, State Warehouse Commissioner". Upon this indorsement the bank cashed for Johnson checks payable to the warehouse commissioner and bearing the rubber stamp indorsement. Johnson converted the money so received to his own use. In reaching the conclusion that the bank in cashing the checks under these circumstances was guilty of gross negligence, the court said: "It does not appear that Rivers, either expressly or by implication, gave to Johnson any greater authority than to place the rubber stamp indorsement on the checks for deposit, nor that he ratified the unlawful acts of Johnson by any acts or words on his part that might lead the bank to believe that Johnson was authorized to demand cash payment of the checks on the rubber stamp indorsement."

Here Link was secretary and assistant treasurer instead of a mere bookkeeper. He had authority to collect the checks and was not simply the medium through which the checks were placed in the hands of the defendant bank for collection. He was the chief executive officer of the mill at Laurens, instead of a messenger or bookkeeper. He had authority equal to that of Rivers.

The cases of Bourne, Probate Judge et al. v. Maryland Casualty Co. et al., 185 S.C. 1, 192 S.E. 605; Merchants' & Planters' Nat. Bank v. Clifton Mfg. Co., 56 S.C. 320, 33 S.E. 750; and Imperial Garage, Inc., v. Bank of Simpsonville, 122 S.C. 50, 114 S.E. 760, on the contrary set forth the law of South Carolina pertinent to this controversy, and in my opinion are decisive of the motion. The decision in the last cited case is very interesting and is as follows:

"The plaintiff in this case sold an automobile to B. M. Moore and took in payment therefor his check for $850. McBride, who was in the employ of the plaintiff, took the check to the defendant bank, upon which it was drawn, and cashed it and took the money and ran away. McBride indorsed the check with a rubber stamp used by the plaintiff, as follows: 'Imperial Garage, Inc., by ......' McBride wrote his own name after the word 'by.' McBride should have deposited the check in Peoples National Bank. Both sides moved for the direction of a verdict in their favor. The presiding judge directed a verdict in favor of the plaintiff, on the ground that the indorsement was unauthorized.

"Acts of 1914, p. 673, § 23, reads:

"'Where a signature is forged or made without the authority of the person whose signature it purports to be, it is wholly inoperative, and no right to retain the instrument, or to give a discharge thereof, or to enforce payment thereof against any party thereto, can be acquired through or under such signature,' unless the party, against whom it is sought to enforce such right, is precluded from setting up the forgery or *want of authority.*'

"The question pertinent to this case is: Is the plaintiff precluded from setting up the forgery or *want of authority?* That question is a question of fact for the jury. It was error to direct a verdict. It is very manifest that any discussion of the facts of this case to show why a verdict should not have been directed would be improper."

In the case of Bourne, Probate Judge, et al. v. Maryland Casualty Co. et al., supra, in sustaining a nonsuit as to the cause of action against the bank in a similar case, the Supreme Court of this State said (page 614): "We do not think that the admitted facts and circumstances constituted constructive notice to the bank that Frierson, the fiduciary, in seeking to have the checks paid as he did, intended to perpetrate fraud upon the estate. It is true that where a check is made payable to a named person, or to his order, the bank is bound to ascertain the identity of the person named as payee, or, if the check

is presented by an alleged indorsee, the bank must ascertain the genuineness of the indorsement. *In the present case, however, as the facts show, the bank was paying the money to Frierson, the depositor, on checks issued by him as administrator, duly countersigned by the attorney in fact of the appellant, and presented to the bank for payment by Frierson himself, who assured the bank that the indorsements of the named payees were genuine; and the bank had a right to assume, as the authorities hold, that the fiduciary would apply the trust funds to their proper purposes under the trust.* We hold, therefore, that the bank was not guilty of any wrong or negligence in its payment of the checks. Frierson's plan to defraud the estate, as already pointed out, was rooted in his official acts; and, as the appellant, as surety on his bond, stood sponsor for the official conduct and integrity of its principal, the trial judge properly disposed of the matter as he did. For if the casualty company as it might have done, had made the shortage of its principal good, the equities being in favor of the bank, the company would have had no right of subrogation as against that institution. There was no error, therefore, in granting the nonsuit." (Italics added)

In the case of Merchants' & Planters' Nat. Bank v. Clifton Mfg. Co., supra, in deciding a like question, the Supreme Court of South Carolina said (page 755): "The defendant suggested to the court that the plaintiff bank had knowledge of enough facts in the business life of the defendant's agent, Fitzsimons, to have put said plaintiff bank on strict inquiry, so that it would not have paid this check drawn in an irregular way; and further, it suggested that the plaintiff had no right to pay a postdated check and charge the same to the account of the defendant mills. It is always well to remember, when it is charged that a duty is owed by one to another, for the breach of which duty a legal liability may be said to exist, how the duty is said to have originated. In this connection it is suggested that by the letters of Mr. A. H. Twitchell, dated September, 1888, addressed to the president of this bank, Mr. T. S. Fitzsimons is brought to the bank's attention as the trusted agent of the defendant mills, and that from the last day of September, 1888, up to 13th January 1899, not one word and not one act intimated that the defendant doubted the entire trustworthiness of their agent.

The defendant placed [it in the power of their agent to draw every dollar] on deposit to the account he managed for the defendant originally; and at no other time during the business relations of plaintiff and defendant was there any restriction placed upon the power of this agent to draw those funds. No such restriction having been made, as suggested by the defendant, upon the power of its agent to draw checks upon said account, unless the bank had positive knowledge that a fraud such as a breach of trust was being attempted by the agent, the bank was bound to honor any checks he might draw. Knobeloch v. Germania Sav. Bank, 43 S.C. 233, 21 S.E. 13; Simmons Hardware Co. v. Bank of Greenwood, 41 S.C. 177, 19 S.E. 502, 44 Am.St.Rep. 700; Fogarties & Stillman v. President, etc., of State Bank, 12 Rich. 518 [78 Am.Dec. 468]. Furthermore, it must be remembered that no bank is made to exercise supervisory functions over its depositors. If knowledge comes to the bank that any agent who is allowed to check upon the funds of his principal on deposit with it is about to commit a breach of trust in drawing checks upon the fund in bank, of course, in such an event, it would be the duty of the bank to protect the rights of the principal; but, to acquire this knowledge, such bank will not be required to exert itself beyond the channels of its business. To hold a bank to a higher duty than that of being bound within the channels of its business in acquiring information of any projected breach of trust by an agent who has the power to check all the funds of the principal from the bank, would imperil the banking interests of the country."

The bank in this case acted in good faith; it paid the money to the highest executive officer locally in charge of the mill who was held out by the corporation to be the main man with whom the public should do business. It paid the money to the assistant treasurer, the man who conducted all the mill's business with the bank. It paid it to him while he was acting as assistant treasurer. Link's plan to embezzle "was rooted in his official acts". The bank had the right to assume he would use the money for mill purposes. It is true that the bank had notice that the checks were stamped "For deposit account of Watts Mills, Laurens, S. C.—C. S. Link, Jr., Assistant Treasurer", but the bank also knew that the man who thus stamped the checks changed the instructions contained in the

indorsement and asked for the cash. The checks that were cashed never came back to the mill, and it made no difference what indorsement was put upon them, as far as secrecy was concerned. Link could have used a blanket indorsement just as well, and demand cash. The mill reposed confidence in Link by selecting him as its chief executive officer at Laurens. Its president and treasurer testified that he had full confidence in his honesty and integrity. He put the financial affairs of the mill absolutely into Link's power without the slightest supervision, except a cursory quarterly audit regularly made. He had the authority and power to draw checks, cash checks and obtain currency. The transactions went on for three years and two months, and the bank had a right to assume that it was legal and that the corporation would find it out if anything was wrong. I do not conceive on what ground the bank could be held bound to assume that the checks thus handled would be used for other than lawful purposes. Under such circumstances, the law will not apply too strict a rule to ordinary business transactions. Under such circumstances the law will not require the bank to pay the money again. Cf. Empire Trust Company v. Cahan, *274 U.S. 473*, 47 S.Ct. 661, 71 L.Ed. 1158, 57 A.L.R. 921.

For the foregoing reasons, it is my opinion that the motion for a directed verdict should be overruled, and for the same reasons, the motion for a new trial denied.

Counsel may submit an appropriate order in accordance with the views herein expressed.