### 11986

### RIVERS, WAREHOUSE COMMISSIONER, *ET AL.* v. LIBERTY NATIONAL BANK OF S. C.

(133 S. E., 210)

1. BANKS AND BANKING—BANK HELD GUILTY OF GROSS NEGLIGENCE IN CASHING CHECKS FOR BOOKKEEPER OF WAREHOUSE COMMISSIONER ON RUBBER STAMP FURNISHED BY BANK FOR USE IN INDORSING CHECKS FOR DEPOSIT.—Where bank had furnished warehouse commissioner with rubber stamp for indorsing checks for deposit, *held*, that bank in cashing checks on such indorsement for bookkeeper employed by warehouse commissioner, in absence of authority therefor, was guilty of gross negligence which was proximate cause of loss.

2. BANKS AND BANKING—WAREHOUSE COMMISSIONER HELD NOT GUILTY OF CONTRIBUTORY NEGLIGENCE, WHERE BANK CASHED CHECKS MADE OUT TO HIM AND PRESENTED BY BOOKKEEPER WITH RUBBER STAMP INDORSEMENT.—Where bank cashed checks payable to warehouse commissioner when presented by bookkeeper with rubber stamp indorsement intended for indorsing checks for deposit, *held*, that there was no contributory negligence on part of warehouse commissioner.

NOTE: Sufficiency of signing or indorsing bill or note by rubber stamp, see note in 7 A. L. R., 672.

Right of sureties of public officer who have made good a loss occasioned by their principal's default or misconduct, to be subrogated to the rights of the obligee or beneficiary of the bond against a third person, see note in 14 L. R. A. (N. S.), 155.

3. SUBROGATION—"SUBROGATION" IS EQUITY ENABLING PARTY SECOND-
ARILY LIABLE, HAVING PAID DEBT, TO REAP BENEFIT OF SECURITIES OR
RIGHTS OF CREDITORS AS AGAINST PRINCIPAL OR OTHERS PRIMARILY
LIABLE.—"Subrogation" is an equity which enables party second-
arily liable, but who had paid debt, to reap benefit of any securities,
remedies, or rights of creditor as against principal or others pri-
marily liable.

4. SUBROGATION—SURETY ON PAYMENT OF DEFALCATION BY BOOKKEEPER
FROM WAREHOUSE COMMISSIONER HELD ENTITLED TO SUBROGATION TO
RIGHT OF WAREHOUSE COMMISSIONER AGAINST BANK, WHICH
THROUGH GROSS NEGLIGENCE PERMITTED DEFALCATION.—Where surety
paid amount of defalcation by bookkeeper from warehouse commis-
sioner, it was entitled to subrogation to rights of warehouse commis-
sioner as against bank, which, because of gross negligence, was re-
sponsible for loss, although the bank did not profit in any way
through the transaction.

Before MEMMINGER, J., Richland, November, 1924. Re-
versed and remanded, with directions.

Action by J. Clifton Rivers, as Warehouse Commissioner,
and another, against the Liberty National Bank of S. C. at
Columbia. Judgment for defendant, and plaintiffs appeal.

*Messrs. Thomas & Lumpkin* and *John M. Daniel, At-
torney General,* for appellants, cite: *What amounts to en-
dorsement and negotiation:* Civ Code, 1922, Secs. 3681 and
3682. *Signature by procuration:* Civ. Code, 1922, Sec.
3672. *Liability of bank for cashing checks upon rubber
stamp endorsement:* 116 N. E., 386; 100 Ala., 476; 132
Mass., 156; 171 N. Y., 219; 106 Va., 347; 103 Mo. App.,
613. *Authority to make restrictive endorsement not suffi-
cient to make general endorsement:* 118 Ga., 433; 45 S. E.,
316. *Bank bound to know depositor's signature:* 7 C. J.,
683. *Depositor must exercise care to examine pass books:*
3 R. C. L., 535. *Audit of Warehouse Commissioner's office
provided for:* Civ. Code, 1922, Secs. 3980 and 3981. *Where
one of two innocent parties must suffer from fraud of
another:* 92 S. C., 336. *How authority of agent acquired
and proved:* 89 S. C., 471; 72 S. C., 255. *Surety company
subrogated to rights of Warehouse Commissioner:* 86 S.
C., 52; 76 S. C., 101.

*Messrs. Melton & Belser,* for respondent, cite: *Each exception to raise one concise question of law:* 100 S. C., 43; 99 S. C., 217; Rule 5 of Supreme Court, 1922, Sec. 6   *Plaintiff's agent had implied authority to receive cash for checks:* 109 Minn., 440; 21 R. C. L., 852.   *Evidence susceptible of construction favorable to defendant:* 119 S. E., 837; 118 S. E., 613; 124 S. C., 314; 124 S. C., 32; 115 S. E., 200; 113 S. E., 37; 113 S. C., 492.   *Endorsement for deposit carries title to the check:* 3 R. C. L., 524.   *Endorsement by agent effective:* Civ. Code, 1922, Sec. 3670; Crawford on Neg. Inst., 51 and 76.   *Estoppel to allege forgery question for jury:* 122 S. C., 50; 103 S. C., 343; Civ. Code, 1922, Sec. 3674; 117 U. S., 96; 110 App. Div. (N. Y.); 636; Crawford on Neg. Inst., 56.   *Directed verdict improper where evidence susceptible of more than one construction:* 119 S. E., 837; 118 S. E., 613; 124 S. C., 314; 124 S. C., 32; 115 S. E., 200; 113 S. E., 37; 113 S. C., 492.   *General law of agency:* 68 S. C., 363; 21 R. C. L., 821 and 855.   *Charge to be taken as a whole:* 121 S. E., 787; 120 S. E., 381; 119 S. E., 870; 124 S. C., 57; 124 S. C., 8; 123 S. C., 358.   *Authority to cash checks gathered from surrounding circumstances:* 21 R. C. L., 854.   *Granting new trial on point involving evidence discretionary:* 120 S. E., 493; 109 S. C., 167; 106 S. C., 571; 103 S. C., 343; Civ. Code, 1922, Sec. 26   Sub. 2. *Surety company not entitled to subrogation:* 108 S C., 371; 68 D. C., 439; 47 Mont., 332; 133 P., 367; 46 L. R. A. (N. S.), 557; 14 L. R. A. (N. S.), 157; 13 Ann. Cas., 430; 117 C. C. A., 313; 198 F., 605; 113 C. C. A., 598; 193 F., 978.   *Duty of surety company:* 114 S. C., 277; 103 S. C., 73; 57 S. C., 466.

May 13, 1926.

The opinion of the Court was delivered by Mr. Justice Stabler.

The following statement is set out in the "Case":

"This action was commenced on the 15th day of Octo-

ber, 1923, by the service of the summons and complaint. wherein plaintiffs demanded judgment against the defendant for the sum of $5,466.41, the amount due the plaintiffs. by reason of the alleged negligence of the defendant in cashing certain checks payable to the plaintiff, J. Clifton. Rivers.

"It was particularly alleged in the complaint that Rivers, as Warehouse Commissioner, had employed one C. E. Johnson, as bookkeeper, who was required to furnish a bond which was executed by the plaintiff Fidelity & Deposit Company of Maryland, in the sum of $5,000, conditioned for the faithful and honest performance of his duties; that the said Johnson was authorized to make deposits of checks and other funds, but had no authority to make collection of any checks payable to the Warehouse Commissioner; but that Johnson by means of illegal and fraudulent indorsement obtained payment of checks from the defendant to the extent of at least $5,466.41; that Johnson misappropriated the proceeds of these checks, and was thereafter duly convicted of breach of trust with fraudulent intent in the criminal court for Richland County; that thereafter the plaintiff, Fidelity Company, paid over $5,000, the amount of the bond, to the plaintiff, Rivers, all of which loss was alleged to have been caused by the negligence of the defendant Bank in cashing the checks; the complaint containing 50 separate causes of action, each based upon the alleged negligence of the defendant in cashing one particular check, and praying for judgment in favor of the Fidelity Company by reason of its rights of subrogation for $5,000, and in favor of the plaintiff, Rivers, for the balance.

"The answer of the defendant set up first a denial of all the material allegations of the plaintiffs' complaint, and, secondly, alleged that it was not responsible to the plaintiff, Fidelity Company, for losses due to the dishonesty of John-

son, whose fidelity and honesty the Fidelity Company had guaranteed and insured in the course of its business and for a valuable consideration; and it was further alleged on the part of the defendant that the plaintiff, Rivers, had negligently employed a dishonest bookkeeper, had intrusted him with a rubber stamp bearing the name of the said Rivers, and had authorized him to use the said stamp for the usual purposes; that the defendant had cashed some checks relying upon the stamped indorsement appearing on the said checks presented by Johnson; and that if the plaintiffs had suffered any loss on account of defalcations of Johnson, they were estopped and precluded by their own negligence and carelessness in failing to call the Bank's attention to Johnson's lack of authority.

"On the issues thus joined, the case came on for trial and was tried before Hon. R. W. Memminger and a jury at the November, 1924, term of Court of Common Pleas for Richland County. There was no dispute about the fact that the ance that Johnson 'should well and truly perform the du- Fidelity Company had executed the bond for $5,000 insur- ties' of his position, and that thereafter paid the sum of $5,000 to Rivers, the Warehouse Commissioner, taking a subrogation receipt for such payment. The evidence tended to show that Johnson, who was the cashier and bookkeeper for the Warehouse Commissioner, had indorsed many checks with the rubber stamp intrusted to him, had obtained cash in many cases from the Bank, and misappropriated a considerable quantity of money. On the issue of negligence, the plaintiffs contended that the defendant was negligent in cashing checks on a rubber stamp indorsement, while the defendant contended that the checks, in most cases, bore the blank indorsement of the payee, J. C. Rivers, Warehouse Commissioner, and were presented by Johnson, the plaintiff's cashier and bookkeeper; that no complaint was ever made to it by the Warehouse Commissioner on account of

the cashing of the checks; and that it had a right to assume that Johnson was authorized to receive payment of checks.

"At the conclusion of all the testimony, both the plaintiffs and the defendant made a motion for the direction of a verdict on various grounds set out in the records, but the Court refused both motions and sent the case to the jury.

"The jury returned a verdict for the defendant, and thereafter a motion was argued for a new trial, which the presiding Judge refused, and in due time notice of intention to appeal was served and appeal taken to this Court."

The exceptions of the appellant are several in number, but under our view of the case it will be necessary to consider only the first exception, which imputes error to the Circuit Judge in refusing to direct a verdict for the plaintiff. In considering the whole matter under this exception, we shall necessarily take notice of and have something to say with reference to the additional grounds for sustaining the verdict advanced by the respondent.

A study of the case discloses an interesting state of facts. The State Warehouse Commissioner, Rivers, one of the plaintiffs in the case, carried with the defendant Bank four deposit accounts: License, storage, bonding, and insurance. He had in his employ, as bookkeeper, one Johnson, who in the course of his duties kept a ledger and cashbooks and deposited cash and checks to the credit of the Warehouse Commissioner in the defendant Bank. In the ledgers were kept the accounts of the various warehouses throughout the State, some 800 in number; the cashbooks contained the entries of cash received, etc. The Bank furnished the Warehouse Commissioner with a rubber stamp to be used for the indorsement of checks to be deposited. This rubber stamp contained the following words: "For deposit in the Liberty National Bank of S. C., Columbia, S. C., J. C. Rivers, State Warehouse Commissioner." It also contained the number "67", which was testified to mean

the Bank's number of the account. Between July, 1921, and February, 1922, the Bank cashed for Johnson a number of checks of various warehouses payable to the Warehouse Commissioner and bearing the rubber stamp indorsement, in some cases in full and in others with the "For deposit" part of the stamp eliminated, and Johnson converted the money to his own use. The entire case centers around these transactions.

Rivers testified that an arrangement was made between him and the bank officials that the stamp was to be used for indorsing checks for deposit only, and that no withdrawals should be made except upon his personal check. According to the testimony of J. C. Rogers, then vice president, and T. J. Trowell, then paying teller of the Bank, they had no conversation with Rivers on this subject. In our view of the matter it is immaterial whether such an agreement was made or not.

Both Rogers and Trowell said that Rivers had never authorized the cashing of checks on the rubber stamp indorsement. The vice president indeed was very frank in his testimony and said that a rubber stamp is used as a matter of convenience to firms and the Bank in depositing checks, but is never used to withdraw funds from the Bank. O. P. Rourke, an accountant employed· by the State Bank Examiner to audit the Warehouse Commissioner's books in connection with Johnson's defalcation, testified that rubber stamps are used as a matter of convenience for indorsing checks for deposit, by firms handling a large volume of checks, and that checks bearing such indorsements are customarily received for deposit and not cash.

This testimony was undisputed. It is quite evident also that Trowell, the paying teller, fully understood and recognized this condition, since he admitted that on one occasion he questioned Johnson about his getting the money for some of the checks instead of depositing them, thus show-

ing that the cashing of the checks was such a departure from the regular methods of business as to arouse his suspicions. It is hard to understand why Trowell, having gone so far, did not at least inquire of Rivers whether he had authorized Johnson to collect cash for checks bearing the rubber stamp indorsement. The only excuse offered by him for his negligence was that he thought he was dealing with responsible parties and that they would make good any discrepancies.

It does not appear that Rivers, either expressly or by implication, gave to Johnson any greater authority than to place the rubber stamp indorsement on the checks for deposit, nor that he ratified the unlawful acts of Johnson by any acts or words on his part that might lead the Bank to believe that Johnson was authorized to demand cash payment of the checks on the rubber stamp indorsement We cannot, therefore, escape the conclusion that the Bank in cashing the checks under these conditions, was guilty of gross negligence.

It is contended, however, by learned counsel for the respondent, that even if the Bank was negligent in cashing the checks on the rubber stamp indorsement, the Warehouse Commissioner, Rivers, was guilty of contributory negligence and should not be allowed to recover against the Bank.

Even if it be conceded that contributory negligence, if shown, would be a defense in this case, the facts already recited show that this contention is without merit. Johnson was simply the medium through which Rivers placed the checks in the hands of the defendant Bank for collection, and had no authority to collect them. They were not checks issued by Rivers himself. They were checks made in his favor on banks other than the defendant Bank, placed in the defendant Bank as deposits for the purpose of collection by that bank. The rubber stamp was furnished, as a matter of convenience, for making indorsements for deposit. Such

a check, so indorsed and placed in the defendant Bank, would then be presented to the bank on which it was drawn, and if paid would be left with that bank; it would be returned to Rivers only in case it was not paid when presented. This is quite a different state of facts from that which exists where a forged or altered check bearing a depositor's name as drawer is cashed by his bank and returned to him in due course along with a statement of his account and other canceled checks. In the latter case he has ample opportunity to learn, through inspection of the statement and the canceled checks, just what the bank has been doing with his money and is under the duty of examining the papers submitted to him by the bank and reporting to it any irregularity in the handling of his account. The irregularity, being apparent on the records accessible to both the depositor and the bank, may be discovered in the ordinary course of business and by the exercise of even ordinary care. In the present case no attempt was made to show that any of the checks in question were ever returned to Rivers, or that he had actual or constructive notice that they had been cashed instead of being deposited to his credit.

But the respondent suggests that Rivers should have gone further and should have audited his books frequently, that is, compared his ledger entries with his cashbook, or listed each day the checks and amounts turned over to Johnson for deposit, and checked such lists against the Bank's records, as in that way the defalcation could have been detected, and that failure to take such precautions amounted to contributory negligence. Rivers claims that, in view of the volume of his business, to do this would have required a great deal of unnecessary labor and expense, and that he could not see why he should take such extraordinary precautions in the matter of checking employees, as he had no reason to think that the Bank would so far forget its duty to its depositor as to pay out money on checks made payable to him without

authority from him to do so or without a proper indorsement of the checks by him.

From all the facts of the case we are led to the conclusion that no contributory negligence on the part of Rivers has been shown, and that the negligence of the Bank was the proximate cause of the loss, and that it could not require of Rivers extraordinary care to save it from the consequences of its own negligent acts.

The case of *Standard Steam Specialty Co. v. Corn Exchange Bank,* 220 N. Y., 478; 116 N. E., 386; L. R. A., 1918-B, 575, is somewhat in point. In that case a stenographer was authorized to use a rubber stamp to indorse checks for deposit as follows:. "Pay to the order of the Greenwich Bank. The Standard Specialty Co." These words. were to be followed by the words in her own handwriting,. "Percy H. Pinder, Treasurer." She indorsed nine checks in her own handwriting with the words, "Standard Steam Specialty Co., Percy H. Pinder, Treasurer," and also indorsed her own name thereon. The checks were cashed for her by two business men who deposited them in the defendant bank. The bank collected the money and paid out the proceeds in the regular course of business. The Court said:

· "If the original indorsement was authorized, the diversion of the funds after indorsement would not make it a forgery; but if the original indorsement was unauthorized, parties dealing with the wrongdoer and innocent parties alike were bound to know the lack of the agent's authority to convey title away from the true owner to any one. Cohen had power to make deposits in the Greenwich Bank; she had no power to collect the checks or even to deposit them elsewhere for collection. She was a mere conduit through which the checks received by her employer passed to her employer's bank for collection. The right to indorse was a mere incident to the authority to deposit. Banking customs imply such authority to indorse *pro forma* from the right to make the deposit to the credit of principal's ac-

count, and it may fairly be said that the specific authority to place this restrictive indorsement on the checks added nothing to Cohen's authority to deposit the checks. The indorsement was a necessary and customary incident to the act of making such deposits. The business man who authorizes his clerk to take his checks to his bank for deposit does not vest in her so dangerous a power as to preclude him from setting up her lack of authority if she indorses his name thereon in blank and innocent persons cash the checks for her without injury. The stringent rules of agency and the arbitrary rules of the law of negotiable paper alike protect the principal from such unauthorized acts. If greater authority has been conferred, expressly or by implication, or if the principal has been negligent or has ratified the conduct of his agent, the law will not shield him."

The liability of the defendant Bank to the Warehouse Commissioner for the loss occasioned by Johnson's defalcation having been now determined, it remains to consider the question of the subrogation of the surety to the rights and remedies of the Plaintiff, Rivers, against the defendant Bank.

Subrogation is an equity which enables a party secondarily liable, but who has paid the debt, to reap the benefit of any securities, remedies, or rights of the creditor as against the principal or (in jurisdictions where the equity extends so far) others primarily liable. As to the rights against the principal, the doctrine of subrogation is universal in its application. As to the rights against third persons responsible for the debt, there is a difference of opinion; but the weight of authority as well as of reason favors subrogation. It appears that this right has been so broadened as to bring within its operation the right to subrogation not only against the principal but also against "one who in equity, justice, and good conscience should pay" the debt. It appears that the doctrine of subrogation is "sufficiently broad to entitle a surety who has paid the

debt of his principal to be subrogated to the remedies and rights which the creditor had, not only against the principal, but against others * * * in the same manner as against the principal debtor"; and that "the surety's right of subrogation extends to rights of action generally"; and that by subrogation he is entitled "to follow funds misappropriated by the principal." 37 Cyc., 415, 416, 417.

In 37 Cyc., 428, it is said:

"Generally the right of the surety to subrogation can be enforced against all persons claiming under the principal with notice of the facts, actual or constructive, or with knowledge that the principal is committing a breach of trust in disposing of the property."

In 25 R. C. L., 1332, we find:

"It has been held in a number of cases that the surety of a fiduciary, who had been compelled to respond to the *cestui que* trust for a breach of trust by his principal, is subrogated to the right of the *cestui que* trust as against the fiduciary and those who participated in such breach. Thus the surety on a guardian's bond, who is compelled to make good a defalcation of the guardian, is subrogated to any right which the obligee has against one who aided in the defalcation. So also the surety of an administrator, who has been compelled by the distributees, next of kin, or creditors to make good the default of his principal, is subrogated to the right of such persons to recover from one who received from the administrator the assets of the estate with knowledge of the latter's fiduciary character or without value. And sureties on the administrator's bond who have been compelled to pay creditors after an order of distribution may be subrogated to the rights of such creditors, and may pursue and recover trust funds in the hands of the administrator, which have been diverted and misapplied. While it seems clear that the equity of innocent sureties should be considered superior to that of one who knowingly participated in the breach of trust of the principal the standing of an inno-

cent participant in such a breach of trust has been passed upon in but few cases."

*United States Fidelity & Guaranty Co. v. People's Bank,* 127 Tenn., 720; 157 S. W., 414, was a case where a guardian deposited trust funds in a bank, to his own personal credit; and drew out the money on his personal checks, used the money for his own personal benefit, and absconded. The bank had knowledge that the money was trust funds. The Court held that both the guardian and the bank were guilty of a conversion, and that the surety paying the wards could be subrogated to the rights of the wards against the bank. The Court in that case, speaking of the rights of the said surety to be subrogated to the remedies and rights of the wards against the bank, said:

"It is insisted that the * * * surety was paid to take the risk, and, having taken it, should not seek to be relieved therefrom by throwing the burden on the bank. The majority are of the opinion that this objection is met by the fact that, when the bank knowingly participated in the conversion, it became personally liable for the fund as cotrustee with the guardian, and that in this situation it owed the money to the wards as much as the guardian owed it, and that the surety was entitled to be subrogated to the rights of action which the creditors whom he paid held against one primarily liable. The liability of the cotrustee, who becomes such *ex maleficio,* by reason of his wrongful dealing with the fund, whereby it is lost, is a liability prior to that of a surety for the ·original trustee, who has been compelled to pay the debt."

In *Mendel v. Boyd,* 3 Neb. Unof., 473; 91 N. W., 860, the Court held that where a bank cashier was a defaulter of money used in gambling transactions on the board of trade, and his sureties paid the bank the amount of the shortage, such sureties were subrogated to the rights of the bank against the broker through whom the money was lost. See, also, *National Surety Co. v. National City Bank of Brook-*

*lyn,* 184 App. Div., 771; 172 N. Y. S., 413. *American Surety Co. v. Vann,* 135 Ark., 291; 205 S. W., 646. *Bank v. Fidelity & Deposit Co.,* 129 Ga., 126; 58 S. E., 867; 12 Ann. Cas., 666.

In *Rhame v. Lewis,* 13 Rich. Eq., 269, it is held that the surety of an administrator who was made to answer to the creditors and distributees, or either, for the default of the administrator resulting from his misapplication of the assets, is entitled to subrogation to the rights and remedies of such creditors and distributees against one who has knowingly contributed to the default, by taking from the administrator the assets *mala fide,* or without value.

In Baylies on Surety and Guarantors, at page 358, it is said:

"The right of subrogation to the remedies of the creditor on payment of the debt of the principal is not restricted to the remedies which the creditor had as against the principal, but extends to all the remedies which he had against the principal and others liable for the debt."

To this effect is the well-reasoned case of *National Surety Co. v. State Savings Bank,* 156 F., 21; 84 C. C. A., 187; 14 L. R. A. (N. S.), 155; 13 Ann. Cas., 421. In that case a Deputy County Auditor in Minnesota issued spurious refund orders on the County Treasurer in favor of fictitious payees, purporting to be for the refund of money paid in for taxes. He procured proper authentication of the orders, forged the names of the fictitious payees to assignments thereof, and sold the same to a bank. A year after the issuance of these orders, they were presented to the County Treasurer and paid. Thereupon the county brought suit against the Auditor on his bond and recovered a judgment which was paid by the surety. The Court said:

"Reason and authority * * * conduce to only one result; and that is that a surety, after paying the debt of his principal, is entitled to be subrogated to remedies which the

principal had against third parties for the claim which the surety paid."

In this case it was urged that the bank did not have actual knowledge and did not participate in the wrong perpetrated upon the creditor (county) by the principal (auditor), and that for this reason the surety should not be subrogated to the rights and remedies of the county against the bank; but on that point the Court said:

"The bank may not have been morally culpable; but its failure to discharge the duty of making inquiries suggested by the non-negotiable character of the orders which it purchased, and by other circumstances attending the transaction, was an act of omission equally as effective to occasion injury to the county as many affirmative acts of commission could have been. such inquiry at the auditor's or treasurer's office would have quickly disclosed that the payees were entitled to nothing, that they were myths, and that misrepresentation. fraud, and forgery were being practiced upon the county. Ignorance in fact occasioned by indulging indifference to almost obvious danger and negligence of the grossest sort is entitled to little consideration by a Court of conscience. The bank's negligence operated as effectually to defraud the county as any willful or intentional participation in the fraudulent scheme could have done. If the bank did not have actual knowledge of the fraud, it did have, under well-recognized law, constructive knowledge of all the facts which reasonable inquiry would have disclosed, and, therefore, of the fraud itself. Such knowledge in ordinary civil actions subjects its possessor to all the consequences of knowledge in fact, and we see no reason why it should not do so in the present case."

The Court also cited in support of its views a number of cases in which the surety was held to be entitled to subrogation to the rights and remedies of creditors against third parties who were affected with constructive knowledge only.

So, in the present case, the question whether the bank was "morally culpable" is immaterial. There is no intimation that the Bank profited in any way through Johnson's wrongdoing, but certainly, through its grossly negligent acts, it participated in his wrongdoing and the loss caused thereby to such extent that without its participation such wrongdoing and loss could not have occurred, and that too in the face of circumstances which unquestionably devolved upon it the duty of making reasonable inquiry, which, in turn, would have disclosed all of the facts as to Johnson's misdoings and have prevented the loss.

Under all the facts, the weight of authority, and our conception of the equities of the situation, we are constrained to hold that the surety bond company should be subrogated to the rights and remedies of Rivers, the insured, against the Bank, to the extent of the amount of the bond paid by the surety company to Rivers.

It may be that the plaintiffs were entitled, under all the facts and the law, to a directed verdict for the entire amount asked for in the complaint; but this point is not raised by any exception before this Court.

The first exception is sustained, and the judgment of this Court is that the judgment of the Circuit Court be reversed, and the case remanded to that Court for a new trial, and that on the trial of the case a verdict be directed for the plaintiffs against the defendant, leaving the amount of such verdict to be assessed by the jury, in accordance with the views herein expressed.

MR. CHIEF JUSTICE GARY and MESSRS. JUSTICES WATTS, COTHRAN and BLEASE concur.