### 13006

SOUTHERN RAILWAY CO. v. SWIFT & COMPANY *ET AL.*

(155 S. E., 429)

November, 1928.

*Messrs. Adam H. Moss, P. F. Haigler* and *Frank G. Tompkins,* for appellant,

*Messrs. D. W. Robinson* and *D. W. Robinson, Jr.,* for respondent,

October 17, 1930.

The opinion of the Court was delivered by MR. JUSTICE CARTER.

This action by the Southern Railway Company, as plaintiff, against the defendants, Swift & Co., C. H. Pfuntner, Improved Ginning & Seed Company, J. J. Haltiwanger, C.

E. Morris. H. T. Hughes, and W. G. Peterkin, was commenced in the Court of Common Pleas for Calhoun County, August 23, 1928, on which date service was made on the defendant, Swift & Co.; service being made on the other defendant at some later date, not disclosed by the record. The suit is an action in claim and delivery for the purpose of recovering from the defendant, Swift & Co. "one (1) three-seventy saw cotton gin outfit, which was in possession of the said Swift & Company, who claimed to be the owner and mortgagee thereof, and which was located at Fort Motte, S. C." The other defendants, according to the allegations of the complaint, were made party defendants because they claimed some interest in the machinery, which right of interest the plaintiff denied. The defendants, Swift & Co. and J. J. Haltiwanger, filed answers. The other defendants defaulted. The case was tried at the November, 1928, term of said Court, before his Honor, Judge M. L. Bonham, and a jury. At the trial, the defendant, J. J. Haltiwanger, through his attorney, withdrew his answer, and stated in open Court that he claimed no interest in the property in question. At the close of the testimony introduced on behalf of the plaintiff, the defendant Swift & Co. made a motion for a nonsuit, which motion, after hearing argument and after due consideration, his Honor, Judge Bonham, granted and issued an order to that effect, stating his reasons for granting the motion. From the order of nonsuit, the plaintiff has appealed to this Court, upon exceptions which will be reported with the case.

The motion for nonsuit was based and granted "upon the ground that the complaint of the Southern Railway set up a cause of action based upon the railway's subrogation to the claim of Herbert B. Davis, and that the testimony showed that the railway company was not subrogated to the rights of Herbert B. Davis."

Did his Honor, Judge Bonham, properly construe the complaint in holding that the complaint set up no other cause

of action than that through subrogation? So much of the complaint as is pertinent to this question is as follows:

"4. That on or about the 29th day of July, 1927, one Herbert B. Davis delivered to the Atlanta, Birmingham and Atlantic Railway Company, at Ben Hill, Ga., for transportation to Fort Motte, S. C., and consigned to himself, one (1) three-seventy saw cotton gin outfit, together with the necessary pulleys, shaftings, belts and appurtenances thereto belonging.

"5. That on or about the 2nd day of August, 1927, the said cotton gin outfit arrived at its destination, Fort Motte, S. C., over the line of and in the custody of the plaintiff.

"6. That on or about the 4th day of August, 1927, the defendant C. H. Pfuntner, claiming to be the agent of the said Herbert B. Davis, and without any authority whatsoever, went to plaintiff's agent at Fort Motte, S. C., and obtained the said cotton gin outfit from plaintiff by signing a receipt therefor, as follows: 'Herbert B. Davis, per C. H. Pfuntner.'

"7. That thereafter the said C. H. Pfuntner moved the said cotton gin outfit from the premises of the plaintiff and placed the same on a lot in the said town of Fort Motte, which he had bought from the defendant W. G. Peterkin, at which place the said cotton gin outfit is now located.

"8. That since the misdelivery of the said cotton gin outfit, as aforesaid, the said Herbert B. Davis brought suit against the plaintiff for the value of the said cotton gin outfit, and did on the 6th day of April, 1928, recover judgment therefor against the plaintiff in the sum of sixteen hundred and seventy-two ($1,672.00) dollars, which judgment plaintiff has paid, *and that by reason thereof, plaintiff is now the owner of, and subrogated to all of the rights of the said Herbert B. Davis in the said three-seventy saw cotton gin outfit, with pulleys, shaftings, belts and all other appurtenances thereto belonging, and is therefore entitled to the possession thereof.* (Italics added.)

"9. That the said cotton gin outfit is wrongfully withheld and detained by the defendant Swift & Company, in whose possession the same now is, notwithstanding that demand has been made upon it by plaintiff for the possession thereof, and that the said Swift and Company refused, and still refuses to deliver the possession of the said cotton gin outfit to the plaintiff.

"10. That the cause of such withholding and detention of the said cotton gin outfit is by reason of a certain chattel mortgage and deed covering the same, which was given to the said Swift and Company by the said C. H. Pfuntner, who had no title thereto, all of which the said defendant Swift and Company, had due notice before the execution and delivery of said mortgage and deed.

"11. That the said property has not been taken for any tax, fine or assessment, pursuant to statute, or seized by virtue of an execution or attachment against the property of the plaintiff.

"12. That the value of the said cotton gin outfit is sixteen hundred and seventy-two ($1,672.00) dollars.

"13. That the defendants, C. H. Pfuntner, Improved Ginning and Seed Company, J. J. Haltiwanger, C. E. Morris, H. T. Hughes, and W. H. Peterkin, claim some interest in the said cotton gin outfit by way of deed, mechanics' lien or otherwise, all of which plaintiff denies.

"Wherefore, plaintiff demands judgment against the defendant Swift and Company, for the delivery to it, and the possession of the three-seventy saw cotton gin outfit, together with the pulleys, shaftings, belts and other appurtenances thereto belonging, which is now in the possession of the defendant Swift and Company, at Fort Motte, S. C., and in case delivery thereof cannot be made and possession had, then for judgment for the sum of sixteen hundred and seventy-two ($1,672.00) dollars, the value thereof, for the costs of this action, and for such other and further relief as may be just and equitable."

Under our view of plaintiff's allegations, it is clear that the plaintiff intended to set up and did set up a cause of action based on the right of sugrogation, and we fail to see wherein any other cause of action is set up or attempted to be set up, and the complaint was so treated at the trial of the case. As disclosed by the transcript of record, during the consideration of the motion for a nonsuit, when the trial Judge, answering the contentions of plaintiff's counsel, stated, "Yes, sir, but you have planted your case flat-footed on the plea of subrogation," counsel for plaintiff answered, "That is our position." Also, in the order of nonsuit issued by the trial Judge, his Honor states: "Plaintiff's counsel frankly state in open Court that it (the action) is based upon subrogation." Under the well-recognized rule, the plaintiff is bound by these admissions. *Ex parte Jones*, 47 S. C., 393, 25 S. E., 285; *Dixon v. Floyd*, 73 S. C, 202, 53 S. E., 167. In this connection, we wish to state that, in our opinion, counsel for plaintiff made a proper and correct admission, and that the trial Judge placed a proper construction upon the complaint.

The next question to be considered is, Did the testimony adduced at the trial show that the plaintiff was subrogated to the rights of Herbert B. Davis? The facts proven pertinent to this question, briefly stated, are as follows: Herbert B. Davis, manager of the Gullet Gin Company, with headquarters in the State of Georgia, had among his customers a man by the name of Poole, of Ben Hill, Ga., and C. H. Pfuntner, of Ft. Motte, S. C. Mr. Davis sold to Mr. Pfuntner, a gin outfit, such as described in the complaint, which he got from Mr. Poole, and Poole looked to Mr. Davis for purchase price of the same. Mr. Davis had this machinery delivered to the railway company at Ben Hill, Ga., for shipment to Ft. Motte, S. C. It appears that Pfuntner paid to Davis a certain sum on the purchase price of this machinery at the time of the trade, the exact

amount of payment is not made clear by the record, and, pursuant to the understanding between the parties, Davis stood between Pfuntner and Poole for the balance of the purchase price, and the machinery was shipped in the name of Davis, consigned to himself (Davis) to Ft. Motte, S. C. It further appears that it was agreed between the parties that the shipment was to be made "order notify," and bill of lading was to be attached to a draft, drawn on Pfuntner for the balance of amount owing by Pfuntner, and forwarded through the banks, so that Pfuntner, by the payment of the draft, could procure the bill of lading and secure the machinery in question from the railway agent at the point of destination, Ft. Motte, S. C. Through some mix-up or misunderstanding, either on the part of Davis or the railway agent at Ben Hill, Ga., or possibly on the part of both of them, the shipment was not made "order notify," but instead a straight bill of lading was issued and the shipment sent open, in the name of Davis, consigned to Davis. The bill of lading thus issued was attached to draft drawn on Pfuntner, for the amount in question, sent through one of the Georgia banks to a bank in Columbia, S. C. Instead of paying the draft and procuring the bill of lading attached thereto for presentment to the railroad agent of the Southern Railway Company at Ft. Motte, S. C., over whose line of railroad the shipment was handled at Ft. Motte, Pfuntner, according to the testimony, represented to the railroad agent that he was the agent of Herbert Davis, in whose name the shipment was made and was allowed to receipt for said shipment and receive the same, signing for the same as follows: "Herbert B. Davis, per C. H. Pfuntner"—and thereby procured the machinery in question from the agent at Ft. Motte, and the machinery was installed on a lot located near the station of plaintiff at Ft. Motte. So far as the record discloses, the plaintiff made no effort to get the machinery back from Pfuntner; neither did Davis, though Davis tried to get Pfuntner to pay the draft. After failing to get Pfunt-

ner to pay the draft, Davis paid to Poole the balance coming to Poole. During this time, so far as the record discloses, the plaintiff, railway company, did nothing, took no action against anyone. Later, Davis instituted a suit against the plaintiff for the amount of the draft, alleging, it appears, that the railway company wrongfully delivered the machinery to Pfuntner, and recovered judgment against the railway company for the amount involved, which judgment the plaintiff railway company paid. After making payment, the plaintiff commenced this suit, the suit at bar; the pertinent parts of the allegations we have quoted above. Before the shipment in question was made, Davis knew that Swift & Co. was to finance Pfuntner in the transaction; knew that Swift & Co. was to let Pfuntner have, in the transaction for purchasing the machinery, as much as about $2,000.00 and must have known that Swift & Co. expected the machinery to stand good for the advances. After the machinery was delivered to Pfuntner and was in his possession, and before any action was begun by anyone concerning the machinery, Pfuntner executed a mortgage over the property to Swift & Co. While it appears that, before the execution of this mortgage by Pfuntner to Swift and Co., Davis wrote a letter to Swift & Co. in which letter he informed Swift & Co. of the fact that Pfuntner had gotten the machinery from the railway company without producing the bill of lading, but in this letter Davis stated that he did not think Pfuntner intended any wrong, and that he thought he would in a short time take up the draft and that things would work out all right. Mr. Davis, in his letter, also mentioned the fact, or made reference to the fact, that Pfuntner had gotten from Swift & Co. in connection with the transaction, the sum of $2,000.00, showing that he (Davis) had knowledge of the fact that Swift & Co. had some interest in the machinery in question; that such interest of Swift & Co. probably arose before the time when the machinery was delivered to the railway for shipment. The machinery was loaded for ship-

ment at Ben Hill, Ga., July 29, 1927; it arrived at Ft. Motte, S. C., over the Southern Railway about August 2, 1927, and was delivered to Pfuntner by the agent of the Southern Railway, at Ft. Motte, August 4, 1927. Davis wrote the letter to Swift & Co., above mentioned, August 25, 1927, which letter made reference to the fact that Davis knew of the advances to Pfuntner, at the beginning of the transaction, by Swift & Co. The chattel mortgage covering the property in question to Swift & Co. by Pfuntner was executed about September 12, 1927, and recorded the following day. Later Pfuntner, before the commencement of the action at bar, executed to Swift & Co. a deed covering the property, in which deed the lien of the said mortgage was expressly reserved. So far as the record discloses, the Southern Railway Company took no steps concerning the property until after suit was brought by Davis against it and procured judgment against it for the amount now involved in the present action, and after paying said judgment, when it commenced this suit in subrogation against Swift & Co.

Such, in substance, are the facts proven in the case as we view the testimony, and we think the same shows that the railway company was not subrogated to the rights of Herbert B. Davis. The essential elements of the right of subrogation are: "(1) That the party claiming it has paid the debt; (2) that he was not a volunteer, but had a direct interest in the discharge of the debt or lien; (3) that he was secondarily liable for the debt or for the discharge of the lien; (4) that no injustice will be done to the other party by the allowance of the equity." *Dunn v. Chapman,* 149 S. C., 163, 146 S. E., 818, 820. It appears that the plaintiff in the case at bar has met the first and second condition above stated, but has not met the third requirement, namely, that it was secondarily liable for the debt in question. The suit of Davis against the Southern Railway Company was based on a primary obligation to safely convey and deliver the machinery delivered to it for trans-

portation from Ben Hill, Ga., to Ft. Motte, S. C. That duty was not a secondary obligation, but a primary obligation, and it was for the failure to perform that primary obligation that judgment was awarded against it. Therefore, the plaintiff's suit, which is based on subrogation, falls. We consider it unnessary to consider the fourth requirement mentioned above, and we shall not pass upon the other questions raised by the exceptions, except to say that in any view of the case we think the trial Judge's order of nonsuit should be sustained.

The judgment of this Court is that the order of the trial Judge, from which the appeal is taken, be and the same is hereby affirmed.

MESSRS. JUSTICES BLEASE and STABLER concur.

MR. JUSTICE COTHRAN (dissenting) : This is an action in claim and delivery for the possession of personal property, consisting of a ginning outfit, valued at $1,672.00. ·

The case was tried before his Honor, Judge Bonham, and a jury at November term, 1928, of the Court of Common Pleas of Calhoun County.

At the close of the testimony for the plaintiff, the defendant Swift & Co. moved for a nonsuit upon the ground that the railway company, plaintiff, was not shown to have been subrogated to the rights of the shipper in the property sued for. The motion was granted, and, from the judgment dismissing the complaint entered thereon, the plaintiff, railway company, has appealed.

The defendants, other than Swift & Co., either failed to answer, or withdraw from the case, leaving the contest between the railway company and Swift & Co.

There is little or no controversy over the facts of this case, which appear to be as follows :

A man by the name of Davis was a representative of a gin company in Atlanta; another by the name of Pfuntner proposed to establish a ginnery at Ft. Motte, in Calhoun County; another by the name of Poole, owned a second-

hand outfit within Davis' territory at Ben Hill, Ga. Pfuntner was a customer of the company represented by Davis; he notified Pfuntner of the prospect of buying the Poole outfit. Pfuntner went to Atlanta and was shown the outfit of Poole. Pfuntner and Davis agreed upon the terms of sale, which were at a certain price cash. Davis became personally responsible to Poole for the price. It was agreed between Pfuntner and Davis that the outfit should be shipped by him from Ben Hill, Ga., to Ft. Motte, S. C., consigned to the shipper, Davis, and that the shipment should be an "order notify" shipment, draft attached to bill of lading and forwarded through the bank for collection from Pfuntner. The bill of lading was issued by a railroad company, a connection of the plaintiff company, and, by some inadvertence upon the part of the railroad company or of the shipper, or perhaps of both, the bill of lading did not show that it was an "order notify" shipment, but appeared to be a "straight" shipment to Davis the shipper. The shipper, Davis, however, apparently not noticing the error, drew a draft upon Pfuntner, attached it to the "straight" bill of lading, and forwarded both through commercial channels for collection. The shipment was made on July 29, 1927, and on August 2d, reached Ft. Motte. On August 4th, Pfuntner called for the shipment, and, upon his signing a receipt therefor in the name of "Herbert Davis, per C. H. Pfuntner," the outfit was delivered to him; the agent of the plaintiff company naturally, from the terms of the waybill, assuming that the shipment was a "straight" shipment, and relying upon the statement of Pfuntner that he was an agent of Davis, the shipper and consignee. Having wrongfully obtained possession of the outfit, he declined or failed to pay the draft which was drawn upon him, as he had agreed should be done in the ordinary course of "order notify" shipments. He installed the machinery in his plant, and has never paid for it. It appears that Swift & Co., interested in the products of Pfuntner's enterprise, had agreed to advance him $2,000.00 with which to

pay for and install an outfit. Instead of using it for that purpose, Pfuntner applied it to other obligations. As soon as Davis was cheered by the return of his draft unpaid, he went to Ft. Motte, but was unable to make the collection. On August 27th, he wrote to Swift & Co.:

"Upon taking it up with Mr. Pfuntner, he states it was his intention to pay the draft every day and secure the original bill of lading but that other demands came upon him first, and he, expecting to return it each day, used the $2,000.00 you let him have, and at this time he is without funds to care for this draft.

"He has assured me that this matter would have attention within the next day or two, but the writer feels you should be advised of the facts that he has not title to the goods as yet, and that you of course would want the matter arranged properly."

Thereafter, on the 10th day of September, Swift & Co., who had been informed of the disposition made by Pfuntner of the $2,000.00 advanced and of the manner in which he had acquired possession of the outfit, had him to execute a mortgage to them upon the entire outfit as security for the advances which had been made by them and misapplied by Pfuntner. It was recorded on September 13th. On April 23, 1928, Pfuntner conveyed by deed the outfit to Swift & Co.

About November 1, 1927, Davis brought suit against Southern Railway Company on account of the misdelivery of the outfit to Pfuntner, and on April 6, 1928, recovered a judgment for $1,672.00 against the railway company, which it paid in full.

On August 23, 1928, the railway company instituted the present action of claim and delivery against Swift & Co. and others. The complaint alleged the foregoing facts in substance. The plaintiff claimed to be subrogated to the rights of Davis in the property as against Pfuntner and Swift & Co.

Swift & Co. answered, denying the claim of the plaintiff and setting up a number of defenses, among which were:

(1) An alleged agreement between it and Pfuntner, in July, 1927, whereby Swift & Co. advanced to Pfuntner $2,000.00 for the purpose of buying and setting up a gin outfit at Ft. Motte, the agreement being that Pfuntner should give it a first mortgage upon the outfit and a second mortgage upon certain real estate, and that pursuant thereto, on September 10, 1927, Pfuntner executed the note and mortgage referred to as security for the advance made in July. (It will be observed in passing that this agreement was made before Pfuntner purchased the particular outfit in question, and of course, could not have had direct reference to it.) It is alleged that the mortgage was given for valuable consideration, namely, "the present advancement of money," the advance of $2,000.00 referred to, and that Swift & Co. was a *bona fide* holder for value thereof.

(2) That the outfit was delivered by the railway company to Pfuntner "as the duly authorized agent of Davis," and that the railway company is estopped from denying the title of Pfuntner and the priority of the mortgage of Swift & Co.

(3) That the alleged misdelivery to Pfuntner was due to the negligence of the plaintiff, which is estopped thereby from disputing the claim of Swift & Co.

The nonsuit was based upon the conclusion of the Circuit Judge that the facts did not sustain the claim of the plaintiff, under the circumstances, to be subrogated to the rights of Davis. In this conclusion, I think that his Honor was in error; for I cannot conceive of a plainer case for the application of the doctrine.

The basic ground, although not the earliest in point of time, of a cause of action in favor of Davis against anyone, was the tortious conversion of the property by Pfuntner consummated by his admitted misrepresentation that he was authorized as the agent of Davis to receive and receipt for

the outfit, a cause of action which inured to him against Pfuntner. Up to that time, while there may have been negligence on the part of the initial carrier, the Atlanta, Birmingham & Atlantic Railroad Company, at Ben Hill, Ga., in issuing an "open" bill of lading instead of an "order notify" one, and an obligation on the part of the delivering carrier, Southern Railway, to answer for the delict of the initial carrier, under the Carmack Amendment, no damage had occurred to anyone until Pfuntner had obtained the goods under a false and fraudulent pretense.

It seems clear that the first active wrong was perpetrated by Pfuntner, and against him Davis certainly had a cause of action, as complete as if a "thief in the night" had stolen the property, a situation which Pfuntner quite nearly approached. The wrong was primarily his, and of course the obligation upon him was primary.

Davis had, under the circumstances, three causes of action, any one of which he might have pursued: (1) Against Pfuntner for his tortious conversion; (2) against the Atlanta, Birmingham & Atlantic Railroad Company, the initial carrier, for its error in issuing a wrong bill of lading; (3) against the Southern Railway Company, the delivering carrier, upon its obligation to respond under the Carmack Amendment.

The obligation of the Atlanta, Birmingham & Atlantic Railroad Company and the Southern Railway Company were in effect to make good the delict of Pfuntner, necessarily secondary obligations.

It is not conclusive of the issue whether the Southern Railway Company was the primary or secondary obligor to say that the action against it was an action upon its contract of carriage, for in every case of secondary obligation there will be found necessarily some relation that has produced an obligation.

The Southern Railway Company had three causes of action: (1) As bailee of the property, against Pfuntner for

his tortious conversion; (2) after paying the loss against the Atlanta, Birmingham & Atlantic Railroad Company on account of its negligence in issuing a wrong bill of lading; and (3) against Swift & Co. for the recovery of practically stolen property, for which the Southern Railway Company was secondarily liable to the shipper, on account of its underwriting the obligation of the initial carrier.

It seems clear that these causes of action were necessarily based upon the primary obligation of Pfuntner and the secondary obligation of the Southern Railway Company which it may have responded to.

"Subrogation is the substitution of another person in the place of a creditor, so that the person in whose favor it is exercised succeeds to the rights of the creditor in relation to the debt." 37 Cyc., 363.

"Subrogation is an equity which enables a party secondarily liable, but who has paid the debt, to reap the benefit of any securities, remedies, or rights of the creditor as against the principal or (in jurisdictions where the equity extends so far) others primarily liable. As to the rights against the principal, the doctrine of subrogation is universal in its application. As to the rights against third persons responsible for the debt, there is a difference of opinion; but the weight of authority as well as of reason favors subrogation. It appears that this right has been so broadened as to bring within its operation the right to subrogation not only against the principal but also against 'one who in equity, justice, and good conscience should pay' the debt." *Rivers, Commissioner, et al. v· Liberty National Bank,* 135 S. C., 107, 133 S. E., 210, 213.

"Subrogation arises in favor of one who in the payment of a debt does so as a surety or is compelled to pay it to protect his own interest. It is purely a creature of equity, depending not upon principles of law, but is so ad-

ministered as to secure essential justice, without regard to form." *Dulaney v. Smith,* Va., 149 S. E., 441, 443.

In *Dunn v. Chapman,* 149 S. C., 163, 146 S. E., 818, 820, the Court said: "In the final precipitation of the matter it has been settled by these and other cases that the essential elements of the right of subrogation are: (1) That the party claiming it has paid the debt; (2) that he was not a volunteer, but had a direct interest in the discharge of the debt or lien; (3) that he was secondarily liable for the debt or for the discharge of the lien; (4) that no injustice will be done to the other party by the allowance of the equity."

See, also, *Hampton, etc., Bank v. Lightsey,* 155 S. C., 222, 152 S. E., 425. *Enterprise Bank v. Bank,* 139 S. C., 397, 138 S. E., 146.

The question appears to me to be settled by the case of *Rivers v. Bank,* 135 S. C., 107, 133 S. E., 210. A surety company had paid the amount of a fidelity bond which it had given to the warehouse commissioner. The defalcation of the officer, the obligor of the bond, was due to the negligence of the bank. The Court held that the surety company upon payment of the bond, was subrogated to the right of the warehouse commissioner against the bank on account of loss entailed by its negligence. It would be as reasonable to deny the surety company the right of subrogation upon the ground that it was but responding to its primary obligation in paying the bond, as to deny the right to a carrier, who had paid a loss due to the rascality of a third person, upon the ground that it was but responding to its primary obligation to carry. The one is no less a secondary obligation than the other.

It appears to me that the present circumstances answer every requirement of the law as thus declared.

The plaintiff, having responded to its secondary obligation to Davis, is entitled to be subrogated to all rights which Davis had against Pfuntner or against the property in the

possession of Pfuntner, unless some equity in favor of Swift & Co. has intervened for their protection.

Swift & Co. claim to be subsequent creditors or purchasers for value without notice of any defect in 'the title of Pfuntner from whom they claim. The evidence is overwhelming and not disputed that Davis notified Swift & Co. as early as August 25th of the conduct of Pfuntner in obtaining possession of the property fraudulently, that he had applied the advance of $2,000 to other obligations, and that he had no title to the property for the reasons stated. Swift & Co. do not come within the protection of either the commercial or the equity rule as explained in *Dearman v. Trimmier,* 26 S. C., 506, 2 S. E., 501. They do not come within the protection of the commercial rule for the reason that when they took the note and mortgage from Pfuntner, they had express notice of how he had obtained the property and that he had no title to it; they do not come within the equity rule, for the reason that they parted with nothing at the time of the mortgage was given. See, also, *Marsh v. Ramsay,* 57 S. C., 121; 35 S. E., 433; *Bank v. Munn,* 134 S. C., 297, 131 S. E., 432; *Kirton v. Howard,* 137 S. C., 11, 134 S. E., 859.

Subrogation is essentially a creature of equity. Can there be any comparison between the equitable position of a carrier which has paid a loss due to the theft of a third person, and that of the holder of a mortgage given by such third person to such holder who had notice of the theft at the time he took the mortgage to secure a past due obligation?

But assuming that I am all wrong as to the application of the doctrine of subrogation to the facts of this case, the order of nonsuit was clearly erroneous for another reason.

The learned Judge held that as the complaint was based solely upon the claim of subrogation, which he held not sustainable, the plaintiff was necessarily confined to that,

and that, under his construction of the complaint, conceded by counsel for the plaintiff, a nonsuit was inevitable.

It is true that, in response to the statement of the Circuit Judge, in a somewhat extended colloquy upon the motion for a nonsuit, "Yes, sir, but you have planted your case flatfootedly on the plea (claim?) of subrogation," counsel said, "That is our position." I do not think that such a statement should conclude the counsel if it should appear that the plaintiff's complaint shows a cause of action entirely independent of the right of subrogation. Admissions of fact by counsel are of course conclusive, but I do not understand that in such a colloquy as was here held an admission by counsel of a certain construction of a pleading, a matter of law should deprive his client of substantial legal right if it should exist.

"A cause of action is stated when the facts alleged show some right of plaintiff, and the invasion of that right by some delict or breach of duty by defendant." *Ward v. Ford,* 58 S. C., 560, 36 S. E., 916.

"Pleadings, under the Code, are not required to formulate the state of facts with refernece to the technical incidents of the right of action to which the plaintiff may suppose himself entitled. It is the Court that refers the facts to their appropriate form of action, for the purposes of its judgment, and not the pleader as at common law. The consequence is, that when a fact is pleaded, whatever inferences of law or conclusions of fact may properly arise from it are to be regarded as embraced in such averment." *Mason v. Carter,* 8 S. C., 104; *Jerkowski v. Marco,* 56 S. C., 402, 35 S. E., 750; *Greewood Cotton Mills v. Tolbert,* 105 S. C., 276, 89 S. E., 653, Ann. Cas., 1917-C, 338.

"Pleadings are not to be technically or rigorously construed, but with a view of substantial justice between the parties." *Childers v. Verner & Stribling,* 12 S. C., 6; *Wallace v. Lark,* 12 S. C., 579, 32 Am. Rep., 516; *Parks v.*

*Cotton Mills,* 70 S. C., 274, 49 S. E., 871; *Market v. North Augusta Co.,* 107 S. C., 137, 92 S. E., 201.

If plaintiff is entitled to any relief under the allegations of his complaint and the evidence submitted in support thereof, it would be error to grant a nonsuit.

If two causes of action were set forth in the complaint without being separately stated, the defendant, it is true, had the right to make a motion that the complaint be made more definite and certain, or, if allegations were made which were unnecessary to sustain the cause of action stated in the complaint, to make a motion to strike out such allegations as irrelevant and as surplusage. Pom. R. & R. R., §§ 447, 451. If the defendant waived said objections by failing to make such motions, then the plaintiff had the right to the relief to which all the allegations showed he was entitled." *Cartin v. Railroad Co.,* 43 S.. C., 224, 20 S. E., 979, 49 Am. St. Rep., 829; *Saunders v. Phelps Co.,* 53 S. C., 176, 31 S. E., 54; *Marion v. City Council of Charleston,* 68 S. C., 258, 47 S. E., 140; *Williams v. Philadelphia Life Ins. Co.,* 105 S. C., 309, 89 S. E., 675; *McKenzie v. Sou. Ry. Co.,* 113 S. C., 459, 102 S. E., 514.

The rule in such cases is thus stated in *Austin v. Mfg. Co.,* 67 S. C., 122, 129, 45 S. E., 135, 137: "The only instances in which the Court will sustain a nonsuit when the allegations are sustained by the testimony are in cases where the complaint is subject to a demurrer, as in *Rosemand v. R. R.,* 66 S. C., 91, 44 S. E., 574. In *Boyd v. Brent,* 1 Tread. Const., 101, it was decided that, if the declaration does not contain any cause of action, the proper way of taking advantage of it is to demur; but, where a nonsuit had been ordered, the Court refused to set it aside, on grounds of convenience, as it was clear that the plaintiff could not recover. In *Pettis v. Harris,* 2 Brev., 388, the Court ruled that a nonsuit may be ordered, though the cause be at issue before the jury, and there is evidence offered pertinent to

the issue, if it be clear there is no sufficient legal cause of action stated in the declaration."

"A nonsuit on the ground that the allegations of the complaint were not sufficient to constitute a cause of action for malicious prosecution was not proper, if they were sufficient to constitute any other cause of action." *Forrest v. McBee,* 72 S. C., 192, 51 S. E., 675, 676.

"A complaint is not demurrable when its allegations show that the plaintiff is entitled to some relief, although he is not entitled to the relief for which he prays." *Conner v. Ashley,* 49 S. C., 480, 27 S. E., 473, 474.

"A complaint is not subject to demurrer if its allegations show that the plaintiff is entitled to àny relief whatever, even though it may be different from that to which the plaintiff supposes he is entitled." *Welborn v. Dixon,* 70 S. C., 112, 49 S. E., 232, 233, 3 Ann. Cas., 407.

If his complaint contains any allegations, which entitles the plaintiff to relief either on the law or equity side of the Court, then it is not subject to demurrer. *Board of Directors v. Lowrance,* 111 S. C., 295, 97 S. E., 830; *Blassingame v. Greenville County,* 134 S. C., 324, 132 S. E., 616; *Spigner v. Provident Life & Accident Ins. Co.,* 148 S. C., 249, 146 S. E., 8.

For a cause directly in point, see *Wilkins v. Howe Grain & Mercantile Co.,* 111 S. C., 85, 96 S. E., 678, 679, an appeal from an order of nonsuit, on the ground that the only cause of action alleged in the complaint was founded upon fraud, and that there was no testimony tending to sustain such allegations, where this Court, construing the complaint to contain allegations sufficient to constitute a cause of action arising *ex contractu,* used the following language: "Under such circumstances, this Court will not undertake to say what particular cause of action the plaintiffs have attempted to set forth, and to which they should be confined, in determining the sufficiency of the complaint"— and, concluding that there was evidence at least tending to

sustain the allegations of damages arising *ex contractu,* held that the Circuit Court was in error in granting the nonsuit.

The right of the plaintiff to recover may be sustained upon the principle that a bailee has a certain limited proprietary right in the property bailed which entitles him to sue for its recovery.

It is a universal rule that "the bailee being entitled to the possession of the property bailed, has a special interest in it which is sufficient to entitle him to sue third persons for loss of or injury to the property, for disturbance of his possession or for breach of contract with the bailee. in regard to the property." 6 C. J., 1149.

This rule has always been recognized in South Carolina. *Jones v. McNeil,* 2 Bailey, 466; *Godfrey v. Pullman Co.,* 87 S. C., 361, 69 S. E., 666, 669, Ann. Cas., 1912-B, 971. In the latter case the Court said: "The rule is that a bailee has such special property or right in the thing bailed as entitles him to protect it against wrongdoers. As against third persons, he may sue for and recover damages for its injury, loss, or destruction.  *  *  * "

Now, this general rule has been applied in many cases to such situations as that under consideration, and it has been held that a carrier which has misdelivered goods may bring an action of trover or replevin against the person to whom such delivery was made. *Fordyce & Swanson v. Dempsey & Beasley,* 72 Ark., 471, 82 S. W., 493; *Johnson & Co. v. Gulf & C. R. Co.,* 82 Miss., 452, 34 So., 357; *American Merchants' Union Exp. Co. v. Willsie,* 79 Ill., 92; *Norfolk S. R. Co. v. Armfield,* 189 N. C., 581, 127 S. E., 557; *N. Y. C. R. Co. v. Freedman,* 240 Mass., 200, 133 N. E., 101; *Chicago, R. I. & P. R. Co. v. N. A. Cold Storage Co.,* 244 Ill. App., 522.

It has been held, very properly, that the carrier in such cases may not recover against one who has purchased from the wrongdoer without notice of his voidable title, on the

ground that, where one of two innocent parties must suffer, he whose negligence or mistake made the loss possible must stand it. *Norfolk S. R. Co. v. Barnes,* 104 N. C., 25, 10 S. E., 83, 5 L. R. A., 611; *Sou. Pac. Co. v. Bank of America* (D. C.), 23 F. (2nd), 939; *Chicago G. W. R. Co. v. Lowry,* 119 Kan., 336, 239 P., 758.

But these cases all recognize the rule that the carrier may recover against one who takes from the wrongdoer with notice.

It will be remembered that the trade between Davis and Pfuntner was that the shipment should be an "order notify" shipment, that Davis drew a draft upon Pfuntner for the purchase price, attached it to the bill of lading, and forwarded the draft for collection through the bank, and that before Swift & Co. took the chattel mortgage upon the outfit from Pfuntner, Davis notified Swift & Co. by letter of August 25th that such had been his course of dealing with the matter and that Pfuntner had secured the property without the bill of lading and consequently had no title. So far as Pfuntner is concerned, his situation is the same as if the shipment had come through as an "order notify" shipment, for that was his agreement. He had no right to secure possession of the property without paying the draft, and Swift & Co., claiming through him, and itself having notice of Pfuntner's misconduct, is bound thereby.

An almost exactly parallel case is that of *In re Hayes Mfg. Co.,* 239 Mich., 247, 214 N. W., 102. In that case a shipper at Toledo delivered to a railroad company a carload of steel for carriage to Detroit. The shipment was "order notify" a metal company in Detroit. A draft was attached to the bill of lading and forwarded to a bank in Detroit for collection. The party intended to be notified and who was expected to take up the draft and bill of lading was a broker and had sold the steel to a company in Detroit. By the carrier's mistake, the steel was delivered to the purchaser without surrender of the bill of lading, and the draft

was never paid. The carrier was responsible to the shipper and paid the loss to him; it then brought suit against the purchaser from the broker. The Court held that the purchaser had notice of the fact of the misdelivery of the goods and had to pay for them. The syllabus is as follows: "Carrier mistakenly delivering shipment to purchaser, who took with notice of outstanding bill of lading with unpaid draft attached, held entitled to recover from such purchaser."

See, also, *Michigan Cent. R. Co. v. State,* 85 Ind. App., 557, 155 N. E., 50.

For these reasons, I think that the order of nonsuit should be reversed.